COMMONWEALTH of Pennsylvania,
Appellant

v.

Peter COLON, Appellee.

Superior Court of Pennsylvania.

Argued Feb. 13, 2001.
Filed May 9, 2001.

Michael Erlich, Asst. Dist. Atty., Philadelphia, for the Com.

David B. Mischak, Philadelphia, for appellee.

Before CAVANAUGH, J., McEWEN, President Judge Emeritus, and OLSZEWSKI, J.

OLSZEWSKI, J.:

¶1 The Commonwealth appeals the trial court's November 30, 1999, order granting appellee's Motion to Suppress.[1] We reverse.

¶2 On April 1, 1999, the police arrested and charged appellee and a co-defendant, Edwin DeLeon,[2] with possession with intent to deliver a controlled substance[3] and possession of a controlled substance.[4] Appellee filed two Motions to Suppress, one on May 7, 1999, and the other on June 25, 1999. Both motions were to suppress all physical evidence seized from his arrest on April 1, 1999. The trial court held a hearing on these motions on September 21, 1999, and on November 30, 1999, granted appellee's motions. On December 30, 1999, the Commonwealth filed this timely

---

1. We note that the Commonwealth has properly certified in its notice of appeal that this suppression order will terminate or substantially handicap the prosecution. *See* Pa. R.A.P. 311(d); *see also Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985).

2. The co-defendant is not a party in this appeal.

3. 35 P.S. § 780–113(a)(30).

4. 35 P.S. § 780–113(a)(16).

appeal challenging the trial court's decision to grant appellee's Motions to Suppress.

¶ 3 The trial court aptly provided a summary of the factual history as follows:

On April 1, 1999, at approximately 9:00 P.M., Officer Shawn Wilson of the Philadelphia Narcotics Strike Force was conducting surveillance at a confidential location on the 3000 block of N. Orianna Street. Officer Wilson observed a male, later identified as the Co-defendant Edwin DeLeon, standing on the west side of N. Orianna Street. Officer Wilson saw a black male and black female walking together, and they both approached the Co-defendant. All three had a brief conversation and Officer Wilson saw the female hand an unknown amount of U.S. currency to the male, who in turn gave the money to the Co-defendant. The Co-defendant reached into his jacket pocket and removed small objects, which he handed to the male and female. The Co-defendant then placed the money in the other jacket pocket, and the couple left the area. Officer Wilson radioed a description of the male and female to back up officers, but they were never apprehended. (N.T. 9/21/99, pp. 8–11).

Approximately five minutes later, Officer Wilson saw a gray Nissan Maxima driving south on Orianna Street. The driver, later identified as [appellee] Peter Colon, parked the car on the west side of the street, about 20 feet away from where the Co-defendant was standing. They conversed briefly, then the Co-defendant took money out of his jacket pocket and handed it to [appellee]. In return, [appellee] handed objects to Co-defendant and he put them in his sock. (N.T. 9/21/99, pp. 12–13).

[Appellee] returned to his car and drove southbound on Orianna Street, then westbound on Indiana Street. Officer Wilson radioed his uniformed back up officers, instructing them to stop a gray Nissan Maxima being driven by a Hispanic male in blue jeans and a white shirt. (N.T. 9/21/99, pp. 13, 58–9). Officers Joyce and Pinkerton received the call and saw [appellee's] car approximately one minute later at 5th and Clearfield Streets. The officers pulled behind the car and followed it to 5th and Allegheny Streets where they activated their lights and sirens, and stopped the vehicle. (N.T. 9/21/99, pp. 59, 68).

Officer Joyce approached the Maxima and asked [appellee] for his driver's license, insurance, and registration. [Appellee] could only produce a driver's license. [Appellee] exited the vehicle at the officer's request and was asked to put his hands on the vehicle. (N.T. 9/21/99, pp. 60, 71). Officer Joyce patted [appellee] down and recovered four clear plastic packets from [appellee's] pockets. Inside each clear packet was a blue glacine packet containing white powder and stamped with the word Turbo, a common stamp for heroin. (N.T. 9/21/99, pp. 60, 65). Officer Joyce put [appellee] in handcuffs, and Officer Pinkerton placed [appellee] in the police vehicle. (N.T. 9/21/99, pp. 72–3).

Officer Joyce walked to the passenger side of the vehicle to close the back window and to determine if there was any contraband in the vehicle. (N.T. 9/21/99, pp. 60, 74–5). At that time, Officer Joyce shined a flashlight in the car and observed a matchbox stamped "Turb" on the rear passenger floor, partially concealed under the front seat. (N.T. 9/21/99, pp. 60, 64, 77). Officer Joyce also noticed newspaper in the matchbox, which he knew from experience to be consistent with the packaging of heroin. Officer Joyce opened the rear passenger's door, confiscated the matchbox, and found packets of heroin

inside. (N.T. 9/21/99, pp. 62, 67–8, 77). In addition, Officer Joyce also recovered $2,862.00 of U.S. currency from appellee. (N.T. 9/21/99, p. 62).

Officer Joyce radioed to Officer Wilson who was still observing the Co-defendant, and informed him that the Maxima was positive for narcotics. A short time later, the Co-defendant left the area in a maroon Jeep Cherokee that was parked on the street. Officer Wilson gave a description of the car to other back up officers and the Co-defendant was stopped shortly thereafter by those officers. (N.T. 9/21/99, p. 13). The Co-defendant was patted down for safety and then the officers searched his sock where Officer Wilson reported that he saw him put drugs, but none were found. (N.T. 9/21/99, pp. 87–8). The Co-defendant was arrested, and after removing his shoe at the police station, officers found fifty-four packets of heroin stamped Turbo. (N.T. 9/21/99, p. 89). The officers also recovered $227 of U.S. currency from the Co-defendant.

Trial Court Opinion, 6/27/00, at 2–4. The police seized a total of two hundred sixty-four (264) packets from appellee, which the trial court suppressed. *See* N.T., 4/9/99, at 8.

¶ 4 The Commonwealth raises the following questions for our review:

I. Did the suppression court err by refusing to consider the totality of the circumstances when concluding that the police lacked probable cause to arrest defendant?

II. Did the suppression court err by ruling that a matchbox labeled as containing narcotics could not be seized by police when lawfully observed in plain view?

Commonwealth's brief at 4.

¶ 5 The Pennsylvania Supreme Court stated:

Our standard of review in addressing a challenge to a trial court's denial [or grant] of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from these facts are correct. When reviewing rulings of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts an may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Hawkins,* 549 Pa. 352, 701 A.2d 492, 504–05 (1997) (citations omitted); *see also Commonwealth v. Nester,* 551 Pa. 157, 709 A.2d 879, 880–81 (1998).

■ ¶ 6 The Commonwealth argues that the trial court should not have granted appellee's motion to suppress because probable cause existed to arrest appellee. Probable cause exists if the facts and circumstances within the knowledge of the police officer at the time of the arrest are sufficient to justify a person of reasonable caution in believing the suspect has committed or is committing a crime. *See Commonwealth v. Myers,* 728 A.2d 960, 962 (Pa.Super.1999). "Probable cause justifying a warrantless arrest is determined by the 'totality of the circumstances.'" *Id.*

¶ 7 When police observe citizens engaged in seemingly suspicious transactions on public streets, the determination of whether probable cause exists can be a difficult one. *See Commonwealth v. Lawson,* 454 Pa. 23, 309 A.2d 391, 394 (1973). In this regard, the Pennsylvania Supreme Court has observed that "all of the circumstances surrounding a transaction between citizens are to be considered in determin-

ing whether law enforcement officers have acted arbitrarily or have acted on the basis of probable cause." *Id.,* (citing *Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134, (1959)). The *Lawson* Court elaborated that:

> All of the detailed facts and circumstances must be considered. The time is important; the street location is important; the use of a street for commercial transactions is important; the number of such transactions is important; the place where the small items were kept by one of the sellers is important, the movements and manners of the parties are important.
>
> * * * *
>
> ▮ It is difficult to isolate any one fact or circumstance and assign to it a given weight. If any one of the facts and circumstances, which we have detailed, were missing, the necessary conclusion of probable cause might not be allowable. Every commercial transaction between citizens on a street corner when unidentified property is involved does not give rise to probable cause for an arrest.

*Lawson,* 309 A.2d at 394. "[A] court will look not just at one or two individual factors, but will consider the 'totality of the circumstances' as they appeared to the arresting officer". *Commonwealth v. Dennis,* 417 Pa.Super. 425, 612 A.2d 1014, 1016 (1992). Moreover, we also "focus on the circumstances as seen through the eyes of the trained officer, and do not view the situation as an average citizen might ... Finally, we must remember that in dealing with questions of probable cause, we are not dealing with certainties. We are dealing with the factual and practical considerations of everyday life on which reasonable and prudent men act." *Id.* (citing *Com-*

*monwealth v. Simmons,* 295 Pa.Super. 72, 440 A.2d 1228, 1234 (1982)).

▮ ¶ 8 Using these standards and the *Lawson* factors to guide us, we begin our analysis. The first and second *Lawson* factors are the time and the street location. *See Lawson,* 309 A.2d at 394. In this instance, appellee met with co-defendant at night at approximately 9:10 p.m. *See* N.T., 9/21/99, at 10–12. The police conducted surveillance on this particular street block because it was known as a "very high drug distribution, buying and selling" area. *Id.* at 9. Officer Wilson testified that he had been involved in over one hundred arrests involving controlled substances on that block in the prior year.[5] *See id.* at 19. He further testified that every one of these arrests resulted in the seizure of controlled substances. *See id.* at 20. Officer Wilson's knowledge of the area's high drug rate is highly relevant in determining probable cause. *See Commonwealth v. Burnside,* 425 Pa.Super. 425, 625 A.2d 678, 681 (1993)(holding that officer's information with respect to prior drug dealing in same vicinity is highly relevant to determination of probable cause).

¶ 9 The third and fourth *Lawson* factors consider the use of a street for commercial transactions and the number of such transactions. *See Lawson,* 309 A.2d at 394. Officer Wilson observed appellee park his vehicle, exit it, and meet with co-defendant on the street in the 3000 block of Orianna Street. *See* N.T., 9/21/99, at 9–11. Co-defendant handed appellee a sum of U.S. currency, and in turn appellee handed co-defendant small dark objects. *See id.* at 12–13, 21, 34. This was the second such transaction Officer Wilson observed within a five-minute period. The first transaction

---

5. Officer Wilson conducted the surveillance on these transactions and put out the infor- mation on buyers to back-up officers to make the arrest. *See* N.T., 9/21/99, at 19.

involved co-defendant and an unidentified male and female where co-defendant provided similar looking small black objects in exchange for a sum of U.S. currency. Officer Wilson testified that based on his experience, he believed each exchange was a drug transaction. *See id.* at 18, 22.

¶ 10 The final two *Lawson* factors consider the place where the small items were kept by one of the sellers and the movement and manners of the parties. *See Lawson,* 309 A.2d at 394. After receiving the small dark objects from appellee, co-defendant bent down and put them in his sock. *See* N.T., 9/21/99, at 13. Immediately after the exchange, appellee left the area in his vehicle.

¶ 11 The trial court relied upon *Commonwealth v. Greber,* 478 Pa. 63, 385 A.2d 1313 (1978), in finding no probable cause existed. In *Greber,* our Supreme Court found no probable cause existed when a police officer witnessed one isolated transaction, involving a shopping bag large enough to contain "a countless number of objects," with no prior information that a drug transaction would occur that evening. *See Greber,* 385 A.2d at 1316. *Greber* is distinguishable on its facts. Unlike the officer in *Greber,* Officer Wilson was conducting surveillance for drug transactions in a high drug area. Also, unlike the officer in *Greber,* Officer Wilson observed two transactions at night involving small dark objects, the second of which was between appellee and co-defendant. Co-defendant subsequently placed the small objects in his sock and appellee immediately left in his vehicle. Officer Wilson testified that based on his experience, he believed both exchanges he witnessed were drug transactions. *See id.* at 18, 22. Officer Wilson based his belief on the hundreds of times he had observed exchanges like this that resulted in arrests involving controlled substances. *See id.* at 18–19. We

find *Greber* to be factually distinguishable and not controlling based upon the differing facts in this case.

■ ¶ 12 The trial court also reasoned that no probable cause existed to arrest appellee because he was involved in only one transaction. It is true that every commercial transaction between citizens on a street corner involving unidentified property does not give rise to probable cause for an arrest. *See Commonwealth v. Agnew,* 411 Pa.Super. 63, 600 A.2d 1265, 1272 (1991). For probable cause to exist under these circumstances, there must be other facts which, together with a suspicious exchange of unidentified items, support a reasonable belief that the exchange is drug related. *See id.* This reasoning is akin to the *Lawson* factors enumerated above. While it is true that appellee participated in only one transaction, we cannot ignore the fact that the person with whom he exchanged unidentified small objects for currency, namely co-defendant, had just completed a similar transaction minutes earlier. These two exchanges involving unidentified objects appeared to Officer Lawson to be consistent with a drug transaction. The exchange took place at night, on the street, in a high drug area. Moreover, after receiving the small objects, co-defendant placed them in his sock instead of his pants or jacket pockets, and appellee immediately left the scene in his vehicle.

¶ 13 Viewing the sum of these facts under the totality of the circumstances, we find they add up to provide the officer with probable cause to arrest appellee. "To rule otherwise would be to take a 'myopic view of the facts and render a decision totally devoid of commonsensical inferences to be drawn by trained police officers with regard to drug activity.'" *Commonwealth v. Burnside,* 425 Pa.Super. 425, 625 A.2d 678, 681 (1993). We find probable cause existed under the totality of the

circumstances to arrest appellee. Therefore, the subsequent stop and search incident to his arrest was lawful. Thus, it was error for the trial court to suppress the four packets of heroin stamped with the word "Turbo" found on appellee's person after he was arrested.

■ ¶ 14 The Commonwealth's next contention is that the trial court erred in suppressing evidence found in appellee's vehicle after he had been arrested. The Commonwealth contends that the police lawfully seized a matchbox[6] labeled "TURB" which they lawfully observed in plain view while standing outside appellee's vehicle. *See* Commonwealth's brief at 21.

¶ 15 In addressing this issue, the trial court reasoned that before the police could *search* appellee's vehicle, they needed to obtain a search warrant because no exceptions applied.[7] While we agree with the trial court's general statement of law, we disagree with its conclusion that the officer *searched* the vehicle to find the matchbox. The issue here concerns seizure of evidence in plain view, rather than a search without a warrant.

■ ¶ 16 In *Commonwealth v. Petroll,* 558 Pa. 565, 738 A.2d 993 (1999), our Supreme Court discussed the law with respect to warrantless seizures of incriminating evidence in plain view. The Court explained:

If a police officer views an object from a lawful vantage point, and the incriminating nature of the object is immediately apparent to the officer, a warrantless seizure of the object is justified. There can be no reasonable expectation of privacy in an object that is in plain view. To judge whether the incriminating nature of an object was immediately apparent to the police officer, reviewing courts must consider the totality of the circumstances.

*Id.* at 999 (citations omitted). Thus, in order for the plain view exception to apply, (1) the officer must view the object from a lawful vantage point, (2) the object must be in plain view, and (3) the incriminating nature of the object must be immediately apparent to the officer. *See id.* Our Supreme Court applied these principles to a police officer's observation of the "plainly viewable interior of a vehicle:"

[T]here is no reason [a police officer] should be precluded from observing as an officer what would be entirely visible to him as a private citizen. There is no legitimate expectation of privacy ... shielding that portion of the interior of an automobile which may be viewed

---

6. The matchbox's dimensions are approximately eight to ten inches long, five inches wide, and one and one-half inches thick. *See* N.T., 9/21/99, at 62.

7. *See Commonwealth v. White,* 543 Pa. 45, 669 A.2d 896, 900 (1995) (holding that the general rule is that a warrant is required to search a vehicle with the following exceptions:
(1) there is probable cause to believe that an automobile contains evidence of criminal activity; (2) unless the car is searched or impounded, the occupants of the automobile are likely to drive away and the contents of the automobile may never again be located by police; and (3) police have

obtained this information in such a way that they could not have secured a warrant for the search, i.e., *there are exigent circumstances.*)
In this case, after the officers found four heroin packets in appellee's pockets, they handcuffed him and placed him in the back of the police car. *See* N.T., 9/21/99, at 60, 72–73. We agree with the trial court that the moment appellee was placed in handcuffs, any exigencies that may have existed prior to that point in time dissipated. Thus, since none of the above exceptions apply, the police could not lawfully *search* the vehicle without a search warrant.

from outside the vehicle by either inquisitive passersby or diligent police officers. In short, the conduct that enabled [the officer] to observe the interior of [the] car and of [the] open glove compartment was not a search within the meaning of the Fourth Amendment.

*Commonwealth v. Milyak,* 508 Pa. 2, 493 A.2d 1346, 1348 (1985) (quoting *Texas v. Brown,* 460 U.S. 730, 740, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality) (brackets and ellipses omitted)).

¶ 17 As noted above, probable cause existed to arrest appellee. Thus, Officers Joyce and Pinkerton were lawfully able to stop and arrest appellee and have a lawful vantage viewpoint into appellee's vehicle. In addition, the officer did not perform a search of the vehicle to locate the matchbox. Rather, the matchbox was in plain view for the officer to observe it. Officer Joyce testified that after appellee was placed in the police cruiser, he went to secure appellee's vehicle because the driver's side door and the passenger's back door window were open. *See* N.T., 9/21/99, at 73–74. Officer Joyce remained outside the vehicle while using a flashlight to look inside the vehicle. *See id.* at 77. At that point he was able to see the matchbox, which was partially under the rear of the front passenger seat. *See id.* at 60, 64, 77. Therefore, the officer did not search the vehicle to locate the matchbox but instead remained outside while merely peering through the window. Thus, we find that Officer Joyce was at a lawful vantage point outside the vehicle and the matchbox was in his plain view. *See Milyak,* 493 A.2d at 1348.

¶ 18 The real issue is whether seeing a matchbox labeled with the letters "TURB" makes the nature of the object immediately incriminating. "To judge whether the incriminating nature of an object was immediately apparent to the police officer, reviewing courts must consider the totality of the circumstances." *Petroll,* 738 A.2d at 993. Officer Joyce testified that in his experience making narcotics arrest and investigations, that "Turbo" is a stamp on heroin packets. *See id.* at 65. When he saw "TURB", he thought it meant "Turbo" for heroin packets. *See id.* This is a logical deduction in light of the fact that they had just seized four packets of heroin labeled "Turbo" from appellee's person. In addition, Officer Joyce testified that he could see newspaper wrappings in the matchbox, which he knew from his experience was used for wrapping bundles of heroin packets. *See id.* at 66. Under the totality of the circumstances, we find that the matchbox's incriminating nature was immediately apparent to Officer Joyce and that the plain view exception is satisfied. Thus, because the officer could lawfully seize the matchbox, the trial court erred in suppressing the matchbox evidence.

¶ 19 Order reversed. Jurisdiction relinquished.

McEWEN, President Judge Emeritus, concurs in the result.