J-S73005-18

2019 PA Super 179

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                 :              PENNSYLVANIA
              Appellee        :
                                 :
            v.                    :
                                 :
BRIAN LUCZKI                  :
                                 :
            Appellant     :        No. 93 WDA 2018

Appeal from the Judgment of Sentence December 18, 2017
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s):  CP-02-CR-0003552-2017

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and OLSON, J.

OPINION BY GANTMAN, P.J.:               **FILED JUNE 7, 2019**

Appellant, Brian Luczki, appeals from the amended judgment of sentence entered in the Allegheny County Court of Common Pleas, following his bench trial conviction for possession of a controlled substance.[1]  We affirm.

In its opinion, the trial court accurately set forth the relevant facts of this case as follows:

> In this case, the evidence presented at [the suppression hearing/stipulated trial] established that on November 29, 2016, Officer William Luffey of the Allegheny County Port Authority Police was working with other police officers as part of the District Attorney task force targeting the sale of illegal narcotics ("DANET").  Officers were in the area of Federal and Henderson Streets on the North Side of Pittsburgh due to complaints of drug sales.  The Sandusky Court housing project is adjacent to the area and the task force had made in excess of thirty drug arrests in the area that month.

---

[1] 35 P.S. § 780-113(a)(16).

Officer Luffey first observed [Appellant] walking away from the officers and toward the Sandusky Court Housing Project. [Appellant] was with an individual known to [Officer] Luffey as he had arrested that individual on drug charges on five prior occasions. [Appellant and the individual] walked toward Sandusky Court and out of the view of the officers. Approximately 14 minutes later, the two individuals were observed coming back from the area of Sandusky Court walking toward the officers. Officer Luffey testified that based on his training and experience, and the observations he made, he believed that the individuals had purchased illegal narcotics. Officer Luffey and Sgt. Wagner who were in plain clothes, but wearing their badges around their necks, waited until the individuals were a few feet away and announced themselves as police officers. Officer Luffey stated, **"I need to speak to you,"** and both [Appellant] and the other individual turned and started to walk away. [Appellant pulled] his hand out of his front pocket and Officer Luffey could clearly see a stamp bag in [Appellant's] hand. After asking [Appellant] to open his hand [Officer Luffey] observed three stamp bags marked "no pain" in [Appellant's] hand. [Appellant] was then placed under arrest for possession of a controlled substance.

(Trial Court Opinion, filed April 27, 2018, at 2-3) (internal citations to record and footnote omitted) (emphasis added). The packets taken from Appellant contained heroin, and the Commonwealth charged Appellant with possession of a controlled substance.

Appellant filed a motion to suppress on August 25, 2017, in which he argued the interaction between the police and Appellant constituted an unlawful search and seizure, without reasonable suspicion or probable cause. Specifically, Appellant claimed the police seized him without reasonable suspicion or probable cause, and searched his person without a warrant, probable cause, or any other valid exception to the warrant requirement.

Appellant claimed the moment the officers approached him with displayed badges and identified themselves as police officers, they had "seized" him, and then conducted an illegal search when the officer ordered Appellant to show what he had in his hand. (*See* Motion To Suppress Evidence, filed 8/25/17, at 4.)

The court conducted a suppression hearing on December 15, 2017. The Commonwealth presented one witness, Officer Luffey, who testified he is a twenty-two-year veteran police officer. He has been working with DANET for nine years, has attended numerous narcotics investigation interdiction classes during his entire career, and had made in excess of thirty arrests over a four-week period in the area where he interacted with Appellant. Officer Luffey stated he and his partner had been assigned to the area due to numerous complaints of illegal drug deals. Officer Luffey said he actually knew Appellant's companion and had arrested Appellant's companion for possession of narcotics five times within the past year. Officer Luffey described how Appellant's and his companion's actions roused the officers' suspicion and explained: "[F]rom my training and experience being in the area where I've made numerous drug arrests over the past few weeks, the history of [Appellant's companion] and the short amount of time they were gone, I believed that the two purchased illegal narcotics." (N.T. Suppression Hearing, 12/15/17, at 3-7). Officer Luffey observed Appellant and his companion as they walked back from the area of Sandusky Court toward the officers. Officer

Luffey stated:

>Commonwealth: Okay. …can you tell the Court what happened after that[?]
>
>Officer Luffey: Sergeant Wagner and myself, we approached the two with our badges displayed and verbally identified ourselves as police officers.
>
>Commonwealth: Officer Luffey, were you in uniform this day or were you in plainclothes?
>
>Officer Luffey: I was in plainclothes as was Sergeant Wagner.
>
>Commonwealth: But you had a badge around your neck?
>
>Officer Luffey: Yes, a badge around my neck and a radio in my hand and verbally announcing myself, which [Appellant's companion] knew me from narcotics encounters with him.
>
>Commonwealth: [Appellant's companion] would have recognized you in plainclothes regardless of your badge?
>
>* * *
>
>Commonwealth: Officer Luffey, did you approach [Appellant] and [his companion]?
>
>Officer Luffey: When we identified ourselves with our badges displayed they both had looks of shock on their face[s] and they started walking away. And when they were doing that I observed [Appellant]. He was going into his front pants pocket. And I could clearly see him removing stamp bags of heroin.
>
>Commonwealth: Now, you said that—your observation of [Appellant] when he removed his hand from his pocket, what did you see in his hand?
>
>Officer Luffey: I could clearly see white stamp bags of heroin. I didn't know how many there were, but I knew it

- 4 -

was heroin.

Commonwealth:     And are you familiar with the packaging that's typically used to sell illegal narcotics?

Officer Luffey:     Absolutely, from working DANET and being a police officer for twenty-two years I've probably made four to five hundred heroin arrests.

Commonwealth:     Can you describe briefly what that stamp bag might look like?

Officer Luffey:     It's the size of a stamp, you know, like, it's white, and each bag always has a mark on it, a label.

Commonwealth:     Okay.  And is that what you observed in [Appellant's] hand?

Officer Luffey:     Yeah.  But I couldn't see the label.  I could see it was a stamp bag, but I could not see the stamping on it.

Commonwealth:     Okay.  And after you observed the stamp bags of heroin in [Appellant's] hand what happened after that?

Officer Luffey:     I advised him to open up his hand and he complied, and there were three stamp bags of heroin stamped "No pain" on them.

Commonwealth:     Now, at any time was [Appellant], prior to this, was [Appellant] detained?

Officer Luffey:     No.  We just approached and identified ourselves as police officers.  And he walked away. He reached into his pocket, and I [saw] the heroin.

Commonwealth:     Was he handcuffed?

Officer Luffey:     No.

Commonwealth:     Prior to observing those stamp bags in his hands did you pat him down?

>Officer Luffey:          Nothing.  No.
>
>Commonwealth:      Okay.  And after you observed the stamp bags in his hand what did you do after that?
>
>Officer Luffey:          That's when I placed him under arrest and detained him.

(*Id.* at 8-11).    During cross-examination, Officer Luffey confirmed the testimony he had given on direct examination about his training and experience, and the fact that the officers were in plainclothes.  The cross-examination testimony added that the officers were on foot in public, and not in police vehicles, when they interacted with Appellant and his companion. Upon the officers' approach, identification, and request, Appellant and his companion separated and turned to walk away, which was when Officer Luffey saw Appellant remove white bags from his right pocket, cupped in his right hand, and in plain view.  The incident occurred in the afternoon, about 4:35 P.M., on November 29, 2016.  The product in the bags confiscated from Appellant tested positive for heroin.  (*Id.* at 11-21).

In closing argument, defense counsel said:

>You heard Officer Luffey's testimony that he approached, identified himself, saw [Appellant] walk away from him pulling something out of his pocket that the officer could tell based on his training and experience was three stamp bags.
>
>I think what you are hearing him testify to is a hunch and a belief that these two individuals were there to purchase or use heroin.  He saw something white come out of my client's pocket.  He assumed that that was a stamp bag based on the fact that my client was with a known drug user.  When he ordered my client to open his hands that is where the unlawful search lies.  Ordering him to open his hands is the

same as telling him to empty his pockets. He suspected there was something illegal in his hand. He ordered him to open it so that he could verify that that was, in fact, something illegal. Once he did that he saw that my client did, in fact, have heroin in his hand. I'm not denying the fact that this officer has been doing this for a long time and he had a good sense of what was going on. It does not give him the right to search my client just because he was in a high crime area with a known drug user. That does not give him a right to conduct a search without something more. **He maybe had reasonable suspicion to conduct an investigatory stop.** He maybe could have asked some questions. But he didn't do that. He ordered him to open his hands. He ordered my client to open his hands and show him the contents of his hands.

I would submit that it was not possible to tell that the white thing in my client's hand was a stamp bag. Maybe there was enough, as I said, to conduct an investigatory detention, but not a search. There was not enough to enable this officer to conduct a search of my client, which is what it was when he ordered him to open his hands. Because of that I would ask you to suppress this evidence. And that's all I have, Your Honor.

(*Id.* at 22-24). In response, the Commonwealth argued:

Your Honor, you heard testimony from Officer Luffey. He's a twenty-two year veteran of the—as a police officer. And you heard his testimony today, that he was working as a DANET—under the DANET team on the day the incident occurred. The reason he was there was because of complaints of open air drug sales. He has been working with the DANET group for the better part of a decade. And he is familiar with the co-defendant in this case and knows him to be a known drug…

\* \* \*

A known drug user. All of these things together would certainly support a reasonable suspicion if not probable cause for him to encounter [Appellant's companion] and [Appellant]. However, Your Honor, I will submit that approaching them does not amount to a search. And

[Appellant's] surprise at being encountered by a police officer and removing those items from his pocket certainly would not amount to a search. And Officer Luffey observed these items in plain view as he testified today.

Once he observed those stamp bags in [Appellant's] hand, asking him to open his hand, I don't think under anybody's rationale would amount to a search as defense counsel is trying to suggest, argue here. Even if it did, Your Honor, it's my belief that [Officer Luffey] had more than enough reason to do that anyway.

Nothing further, Your Honor.

(*Id.* at 24-26).

The court considered the testimony as well as the arguments of counsel, recognized that Appellant's mere presence in the crime area or simply associating with a known drug user would not itself be illegal, but concluded the initial interaction between Appellant and the officers was a "mere encounter." The circumstances, however, changed as soon as Officer Luffey saw the stamp bags in Appellant's hand. The court reasoned:

Thank you. Well, this is one of those weird cases where the irony is that what the result was—I don't know how to articulate it—I don't think there was a sufficient basis to search [Appellant]. But that's not what happened.

This is one of those strange cases. I agree that in the standard of, like, being in a drug area and maybe [whom] you associate with would cause an officer within [his] experience to look at things differently. But I also don't subscribe to the belief, and I think [defense counsel] said it's because—we've had other cases in this—which is, that if you live in a certain area you're pretty much going to get searched. You know, that's not the thing. And there are plenty of people [who] would be in that area [who] aren't doing anything suspect, and they are just poor. Okay. That's one thing.

- 8 -

See, I look at all those circumstances, that [Appellant] is with a known drug user and that…maybe doesn't add anything. Just observing him walking on that street going toward Sandusky Court, which I think everybody in the entire county knows what goes on in Sandusky Court. And the—as far as the drug trafficking and crime there, that still doesn't add [up].

But what this turns on for me is what the interaction is and what was said. Now, had they said "stop" or "hold on" or "give me everything in your pockets" or, I don't know, I could describe it a number of different ways. In this case the police officers are conducting the interdiction through DANET. They are watching the area.

At this point, then, when they say to these two individuals, one of whom is known to this officer, "Hey, police officers—" wait, and I wrote it down. "Can we talk to you?" Let me just make sure. I actually highlighted it. "Police officers. Can we speak to you?" It's an interaction. It wasn't, "Stop. Get over here." There wasn't any—so he just says, "Can we speak to you?" And then the individuals turn around and start to walk away.

And what it turns on for me is at that point if they had grabbed them and started searching them, I would agree with you. I can't explain why people do stuff. But the testimony was clear. The witness didn't say, "I saw something white and suspected it to be a stamp bag." He said, "I saw a stamp bag. I couldn't see how many, but I clearly saw a stamp bag."

And to me at that point, then, that does change things. And the reason I say there is irony to it is because if he hadn't I don't think there would have been at that time probable cause. There certainly wouldn't have been probable cause to search them. There might have been reasonable suspicion to go on and do something else, but there certainly wasn't probable cause to search at that time. But [Officer Luffey] didn't need [probable cause] because [what he saw] was in plain view. And that's where it turned for me. Again, I have to go with the uncontradicted evidence that was presented here, not what your side is, I get that,

but I'm just going on the standard. On the standard here the officers are free to say to people all the time, they're like free to wander among us, and they're free to watch things, and they're free to speak to us as long as they are not seizing us or leading us to believe that we are not free to interact or we are not free to leave and that we must interact with them. And they said, "Hey, police officers, can we talk to you?" And then the witness sees what he clearly sees as a stamp bag. He said he didn't know the number. I know what you are saying. It's just that it's not consistent with what he testified to repeatedly.

And even under cross-examination, depending on how the testimony was—I didn't hear anything that you crossed him with that was inconsistent with what he said, which is that, you know, again, I would have to go through the whole transcript to see…, but nothing was inconsistent with what he testified to today.

With respect to why would anyone do that, I don't know why anyone does anything. I really don't. I couldn't explain why people do things in a panic or whatever it is. But I don't have any reason at this point, absent some other factors, to take that as anything other than credible testimony that given [Officer Luffey's] training and experience he clearly recognized at least one stamp and didn't know how many [bags], and that the command to open his hand determined what the number was. So while I completely understand the issues that you raise I just wouldn't agree with respect to what the facts show the interaction was.

So based on that I will respectfully deny your motion.

(***Id.*** at 26-30).[2]

---

[2] In its Rule 1925(a) opinion, the trial court explained more clearly how it found the initial interaction between the police officers and Appellant was a mere encounter that required no reasonable suspicion or probable cause. When Appellant turned to walk away from the officers and pulled stamp bags from his pocket, Officer Luffey saw the bags in plain view, cupped in Appellant's hand. Officer Luffey instantly recognized the bags as "stamp bags"

Immediately following the suppression hearing, the court conducted a jury-waiver colloquy, proceeded with a stipulated bench trial, and convicted Appellant of one count of possession of a controlled substance as charged. Also on December 15, 2017, the court initially sentenced Appellant, but on December 18, 2017, the court entered a corrected sentencing order and imposed three (3) to six (6) months' incarceration, plus sixteen (16) months' probation. By order filed on January 3, 2018, the court also granted Appellant early parole and set his release for within 48 hours of January 12, 2018.

Appellant filed a timely notice of appeal on January 12, 2018. The court ordered Appellant on January 16, 2018, to file a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(b) by February 16, 2018. Appellant timely complied on February 15, 2018. In his Rule 1925(b) statement, Appellant essentially ignored defense counsel's concessions on the record at the suppression hearing, about reasonable suspicion for the initial interaction between the officers and Appellant and his companion, as reiterated in defense counsel's closing argument, which focused solely on the search conducted **after** Officer Luffey saw the "stamp bags." (**See** N.T. Suppression Hearing at 22-24). Instead, Appellant renewed his original position as follows:

This Honorable Court erred when it denied [Appellant's]

---

used for heroin distribution, which gave Officer Luffey probable cause to order Appellant to open his hand fully. (**See** Trial Court Opinion, filed April 27, 2018, at 3.)

- 11 -

Motion to Suppress Evidence. The seizure and subsequent search of [Appellant's] person were illegal and conducted in violation of [his] rights under the Fourth and Fourteenth Amendments to the United States Constitution, as well as Article One, Section Eight of the Pennsylvania Constitution, for the following reasons:

a. [Appellant] was subjected to a seizure where two police officers who had identified themselves as such approached him with their badges displayed and one stated, "I need to speak with you." This seizure was not supported by reasonable suspicion that [Appellant] was engaged in criminal activity or by probable cause to arrest him.

b. The police officer's subsequent order to [Appellant] "to open up his hand" was a search of [Appellant's] person. This search was conducted without a warrant and in the absence of any delineated exception to the warrant requirement.

(Appellant's Concise Statement of Errors Complained of on Appeal, filed 2/15/18, at 3) (unpaginated).

Appellant now presents the following issue on appeal:

DID THE TRIAL COURT ERR IN DETERMINING THAT [APPELLANT]'S RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AS WELL AS ARTICLE ONE, SECTION EIGHT OF THE PENNSYLVANIA CONSTITUTION, WERE NOT VIOLATED WHEN [APPELLANT] WAS SUBJECTED TO A SEIZURE—AN ILLEGAL INVESTIGATORY DETENTION, NOT A MERE ENCOUNTER—WHEN TWO POLICE OFFICERS WHO HAD IDENTIFIED THEMSELVES AS SUCH APPROACHED HIM WITH THEIR BADGES DISPLAYED AND ONE STATED, "I NEED TO SPEAK WITH YOU"?

(Appellant's Brief at 4).

Appellant argues the police violated his constitutional right to be free

from unlawful seizures and searches. Specifically, Appellant complains Officer Luffey "seized" Appellant in an investigatory detention, at the outset of their interaction, because no reasonable person would not have felt free to walk away from Officer Luffey under the circumstances. Appellant claims Officer Luffey illegally detained Appellant, based on no more than a "hunch" that Appellant had purchased drugs. Appellant submits the trial court erred when it characterized the nature of his initial interaction with Officer Luffey as a mere encounter, where the officers' display and assertion of authority would lead a reasonable person to believe he was not free to decline the officers' requests to speak with them or otherwise terminate the contact. Appellant emphasizes that, when Officer Luffey said to Appellant, "I need to speak with you," the statement was the functional equivalent of a command to stop, which only an unreasonable and imprudent citizen in Appellant's position would have felt free to ignore. As a result, Appellant contends the search following his unlawful detention was likewise illegal; and the trial court erred in denying the suppression motion. Appellant concludes this Court should reverse and remand for a new trial with instructions to suppress the evidence. We disagree.

Appellate review of an order that denied a motion to suppress evidence is as follows:

> We may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of

the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. An appellate court, of course, is not bound by the suppression court's conclusions of law.

*Commonwealth v Arter*, 637 Pa. 541, 546-47, 151 A.3d 149, 153 (201) (quoting *Commonwealth v. Gary*, 625 Pa. 183, 189-90, 91 A.3d 102, 106 (2014)). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Clemens*, 66 A.3d 373, 378 (Pa.Super. 2013).

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee the right of the people to be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures. *Commonwealth v. Morrison*, 166 A.3d 357, 363-64 (Pa.Super. 2017). "To secure the right of citizens to be free from unreasonable search and seizure, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty." *Commonwealth v. Hampton*, 204 A.3d 452, 456 (Pa.Super. 2019). Because interactions between law enforcement and the general citizenry are widely varied, search and seizure law looks at how the interaction is classified and if a detention has occurred. *Commonwealth v. DeHart*, 745 A.2d 633, 636 (Pa.Super. 2000).

Our Supreme Court in *Commonwealth v. Adams*, ___ Pa. ___, ___,

205 A.3d 1195, 1199-1200 (2019) recently reiterated the general levels or classifications of contacts between the police and the citizenry and reviewed long-standing precedent on the topic as follows:

> The first is a mere encounter, sometimes referred to as a consensual encounter, which does not require the officer to have any suspicion that the citizen is or has been engaged in criminal activity. This interaction also does not compel the citizen to stop or respond to the officer. A mere encounter does not constitute a seizure, as the citizen is free to choose whether to engage with the officer and comply with any requests made or, conversely, to ignore the officer and continue on his or her way. The second type of interaction, an investigative detention, is a temporary detention of a citizen. This interaction constitutes a seizure of a person, and to be constitutionally valid police must have a reasonable suspicion that criminal activity is afoot. The third, a custodial detention, is the functional equivalent of an arrest and must be supported by probable cause. A custodial detention also constitutes a seizure.
>
> No bright lines separate these types of [interactions], but the United States Supreme Court has established an objective test by which courts may ascertain whether a seizure has occurred to elevate the interaction beyond a mere encounter. The test, often referred to as the "free to leave test," requires the court to determine whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. [W]henever a police officer accosts an individual and restrains his freedom to walk away, [the officer] has "seized" that person.

*Id.* at ___, 205 A.3d at 1199-1200 (most internal citations and quotation marks omitted). Whether a seizure has occurred, under the circumstances related in the undisputed testimony at a suppression hearing, is a question of law involving a plenary scope of review. *Commonwealth v. Au*, 615 Pa.

330, 337, 42 A.3d 1002, 1006 (2012). Our standard of review regarding questions of law is *de novo*. **Commonwealth v. McGarry**, 172 A.3d 60, 65 (Pa.Super. 2017), *appeal denied*, ___ Pa. ___, 185 A.3d 966 (2018).

When initially evaluating the level of interaction between law enforcement and a citizen to determine if a seizure occurred, "courts conduct an objective examination of the totality of the surrounding circumstances." **Commonwealth v. Lyles**, 626 Pa.343, 350, 97 A.3d 297, 302 (2014).

> The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority. Under this test, no single factor controls the ultimate conclusion as to whether a seizure occurred—to guide the inquiry, the United States Supreme Court and this Court have employed an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter. [W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.
>
> This Court and the United States Supreme Court have repeatedly held a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification. Officers may request identification or question an individual so long as the officers do not convey a message that compliance with their requests is required. Although police may request a person's identification, such individual still maintains the right to ignore the police and go about his business.

*Id.* at 350-51, 97 A.3d at 302-03 (internal citations and quotation marks omitted).

> To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to

determine whether the demeanor and conduct of the police would have communicated to a reasonable person that he…was not free to decline the officer's request or otherwise terminate the encounter. A variety of factors may influence this determination, including the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. As our High Court has explained, subtle factors as the demeanor of the police officer, the location of the confrontation, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements must be considered.

**Hampton, supra** at 457. In addition:

This Court has also set forth the following non-exclusive list of factors:

the number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked. Otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

**Commonwealth v. Newsome**, 170 A.3d 1151, 1155 (Pa.Super. 2017)

(internal citations omitted). Our Supreme Court has also stated:

We recognize the conceptual difficulties inherent in the administration of the reasonable-person standard. Although the test is cast in objective terms, absent empirical proofs, there remains substantial room for reasonable disagreement concerning how such a hypothetical person might feel in any given set of circumstances. Such differences have been manifested, at both the federal and state level, in many divided opinions on the subject. Nevertheless, the High Court has settled on an approach allocating very modest weight to the possibility for

> psychological coercion arising from a fairly wide range of police conduct which may be regarded as being appropriate to and inherent in the circumstances facilitating the interaction. *Cf.* Wayne R. LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> § 9.4(a), at 425 (4th ed. 2004) (observing that "the confrontation is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse[,]" which include moral and instinctive pressures to cooperate).

*Au, supra* at 338-39, 42 A.3d 1007-08 (most internal citations omitted).

Thus, all law enforcement communications with a citizen do not automatically constitute detentions. *Lyles, supra* at 354, 97 A.3d at 304-05. With respect to the show of authority needed for a detention, the circumstances must present some level of coercion, beyond the officer's mere employment, that conveys a demand for compliance or threat of tangible consequences from refusal. *Commonwealth v. Young*, 162 A.3d 524, 529 (Pa.Super. 2017) (citing *Lyles, supra* at 353-54, 97 A.3d at 304).

> An investigative detention, unlike a mere encounter, constitutes a seizure of a person and thus activates the protections of Article 1, Section 8 of the Pennsylvania Constitution. To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot. Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate.
>
> \*   \*   \*
>
> Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped

was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a [person] of reasonable caution in the belief that the action taken was appropriate.

*Commonwealth v. Jones*, 874 A.2d 108, 116 (Pa.Super. 2005) (internal citations omitted). "[T]he question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity."

*Commonwealth v. Cottman*, 764 A.2d 595, 598-99 (Pa.Super. 2000) (quoting *Commonwealth v. Beasley*, 761 A.2d 621, 625 (Pa.Super. 2000), *appeal denied*, 565 Pa. 662, 775 A.2d 801 (2001)).

In making this determination, we must give due weight…to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Commonwealth v. Young*, 904 A.2d 947, 957 (Pa.Super. 2006), *appeal denied*, 591 Pa. 664, 916 A.2d 633 (2006) (internal citations and quotation marks omitted). "[W]hether the defendant was located in a high crime area…supports the existence of reasonable suspicion." *Commonwealth v. Foglia*, 979 A.2d 357, 361 (Pa.Super. 2009) (*en banc*), *appeal denied*, 605 Pa. 694, 990 A.2d 727 (2010) (internal citations omitted). *See, e.g., Commonwealth v. Valentin*, 748 A.2d 711 (Pa.Super. 2000), *appeal denied*,

- 19 -

564 Pa. 731, 766 A.2d 1247 (2000) (concluding reasonable suspicion for stop existed where officer, who had made many narcotics arrests and was familiar with drug trafficking that regularly took place in surveilled location, observed exchange of cash for small objects; in light of officer's experience, he reasonably suspected that drug sale had occurred). *See also In Interest of S.J.*, 551 Pa. 637, 643, 713 A.2d 45, 47-48 (1998) (concluding reasonable suspicion for stop existed, where officer had previously made six arrests involving drug activity in same high crime area, detected odor of marijuana and observed group of men smoking marijuana; when officer approached group, defendant tried to hide among other members of group; officer's actual observance of illegal activity combined with defendant's suspicious behavior, was enough to justify investigatory stop of defendant, but not ensuing pat down for weapons).

"Probable cause is made out when the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which [the officer] has reasonably trustworthy information, are sufficient to warrant [an officer] of reasonable caution in the belief that the suspect has committed or is committing a crime." *Commonwealth v. Thompson*, 604 Pa. 198, 203, 985 A.2d 928, 931 (2009) (internal quotation marks omitted).

> The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require **only a probability**, and not a *prima facie* showing, of criminal activity. In determining whether probable cause exists, we apply a totality of the circumstances test.

*Id.* (emphasis in original) (internal citations and quotation marks omitted). The officer's training and experience are a factor in determining probable cause but relevant to the issue only if there is a nexus between those skills and the search and seizure of the person and/or evidence. *Id.* at 210, 985 A.2d at 935.

"Although cases involving similar or comparable seizure determinations may serve as guideposts, a suppression court must independently employ the totality-of-the-circumstances test in determining whether a seizure occurred." *Lyles, supra* at 354, 97 A.3d at 305. *See, e.g., id.* (holding that no single factor controls in seizure-of-person analysis; police officer's request for identification alone does not raise escalatory inference of detention; courts must make independent examination of totality of circumstances surrounding interaction to determine if seizure occurred; concluding no "seizure" occurred in absence of credible evidence of physical restraint, weapons used, blockade or obstruction of citizen's ability to walk away; tenor of interaction was not inherently coercive); *Au, supra* (holding unrebutted testimony of officer established only mere encounter with Appellee had occurred, when officer interacted with Appellee in public, did not activate emergency lights, did not block Appellee's car, did not brandish weapon, make intimidating movement or overwhelming show of force, threat, or command, or speak in authoritative tone; use of officer's headlights and flashlight was in furtherance of officer's safety and within ambit of acceptable, non-escalatory factors); *Newsome,*

*supra* (holding defendant was not "seized" during his initial interaction with officer, where officer responded to radio call in marked cruiser and saw Appellee walk away from group of males; officer exited his vehicle and told Appellee to "come here," but Appellee refused and continued to walk away; officer then observed Appellee remove object and place it in nearby flowerpot; object later recovered was firearm); *Young, supra* (holding initial interaction with Appellee was mere encounter, when three officers in plainclothes exited an unmarked vehicle, approached Appellee on public street and asked Appellee what he was doing and whether he had anything on his person that could harm officers; two brief questions constituted mere encounter, as there was no restraint of Appellee's liberty, no physical force, and no show of authority or level of coercion, beyond officer's mere employment, to convey demand for compliance or threat of tangible consequences from refusal). *Compare Adams, supra* (holding interaction between police officer and defendant was investigative detention, where officer would not allow defendant to leave his vehicle; officer did not simply request that defendant stay in his car; instead, officer physically closed car door and barred defendant's exit; officer's action of physically closing door as defendant opened it communicated demand to remain in car at that location; officer's acts constituted type of escalatory factor that signals "seizure" by restraint of freedom); *Commonwealth v. Livingston*, 644 Pa. 27, 174 A.3d 609 (2017) (plurality) (holding interaction between police officer and defendant was

investigative detention, where defendant's car was already parked on side of interstate highway, and officer pulled his patrol car alongside defendant's car, with his emergency lights activated, ostensibly under community caretaking function, but officer was unable to articulate specific and objective facts to suggest defendant needed assistance); ***Hampton, supra*** (holding interaction between police officer and defendant was investigative detention, where defendant drove his vehicle from roadway into church field, and officer pulled her marked vehicle into field behind defendant's car, effectively blocking his exit, as defendant's vehicle was facing building so he could not travel forward). Importantly, "The issue of whether an individual has been seized is distinct from the issue of whether that seizure was reasonable." ***Hampton, supra*** at 458.

A warrantless search or seizure of evidence is likewise "presumptively unreasonable under the Fourth Amendment and Article I, § 8, subject to a few specifically established, well-delineated exceptions." ***Commonwealth v. McCree***, 592 Pa. 238, 247, 924 A.2d 621, 627 (2007). "The 'plain view' doctrine is often considered an exception to the general rule that warrantless searches are presumptively unreasonable…." ***Id.*** (quoting ***Horton v. California***, 496 U.S. 128, 133, 110 S.Ct. 2301, 2306, 110 L.Ed.2d 112, ___ (1990)). "The plain view doctrine provides that evidence in plain view of the police can be seized without a warrant…." ***Commonwealth v. Anderson***, 40 A.3d 1245, 1248 (2012), *appeal denied*, 616 Pa. 666, 51 A.3d 837 (2012).

> This doctrine permits a valid warrantless seizure of an item where: (1) the police have not violated the Fourth Amendment in arriving at the location from which the item could be viewed; (2) the item is in plain view; (3) the incriminating character of the item is immediately apparent; and (4) the police have a lawful right of access to the item itself.

*Commonwealth v. Jones*, 605 Pa. 188, 201, 988 A.2d 649, 656 (2010), *cert. denied*, 562 U.S. 832, 131 S.Ct. 110, 178 L.Ed.2d 32 (2010). Courts have alternatively described the plain view doctrine in terms of a three-prong test. *See Commonwealth v. Miller*, 56 A.3d 424, 429 (Pa.Super. 2012) (stating: plain view doctrine permits "the warrantless seizure of an object when: (1) an officer views the object from a lawful vantage point; (2) it is immediately apparent to him that the object is incriminating; and (3) the officer has a lawful right of access to the object").

> There can be no reasonable expectation of privacy in an object that is in plain view. To judge whether the incriminating nature of an object was immediately apparent to the police officer, reviewing courts must consider the totality of the circumstances.

*Commonwealth v. Colon*, 777 A.2d 1097, 1103 (Pa.Super. 2001) (quoting *Commonwealth v. Petroll*, 558 Pa. 565, 738 A.2d 993 (1999)). "In viewing the totality of the circumstances, the officer's training and experience should be considered." *Miller, supra* at 430 (citing *Commonwealth v. Liddie*, 21 A.3d 229 (Pa.Super. 2011) (*en banc*)). "[T]here is no reason [a police officer] should be precluded from observing as an officer what would be entirely visible to him as a private citizen." *Colon, supra* at 1103. The plain view doctrine

is concerned with the "seizure of evidence rather than a search without a warrant." *Id.* *See, e.g., Commonwealth v. Kendrick*, 490 A.2d 923, 927 (Pa.Super. 1985) (explaining seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming there is probable cause to associate property with criminal activity; experienced officer trained in narcotics can seize object, when he observes it from lawful vantage point, and holder of object tries to conceal object; given incriminating character of object, officer could open object and examine contents).

In the present case, the uncontradicted testimony at the suppression hearing revealed that Officer Luffey and another officer were patrolling a section of Pittsburgh identified and confirmed as an area of high drug sales. Officer Luffey observed Appellant and his companion walking toward a known, high-drug-trafficking area, where Officer Luffey's task force had made over 30 drug arrests during the month of the incident. Officer Luffey recognized Appellant's cohort as an individual Officer Luffey had arrested for possession of narcotics five times in the past year. Appellant and his companion disappeared for approximately fourteen minutes, and returned, walking toward the officers' general location. Both officers were in plainclothes, on foot, and on a public street. The interaction took place at 4:35 P.M., on November 29, 2016, in daylight. When Appellant and his companion came within several feet of the officers, Officer Luffey audibly identified the officers as police and said, "I need to speak with you." That was the sum and

substance of their initial interaction. In response, Appellant and his companion separated and turned to walk away from the officers.

The focus of Appellant's challenge to the initial interaction with police rests on the badges around the officers' necks and Officer Luffey's comment to Appellant. This initial interaction between the officers and Appellant and his companion, however, was limited, informal, and carried all the hallmarks of a mere encounter. In detail, the interaction occurred in daylight, on a public street, with police officers dressed in plainclothes, and on foot. The interaction involved no lights, guns, marked vehicles, intimidating movement or potent show of force, obstruction, or physical restraint. The officers' displayed badges, which merely identified their employment, conveyed no demand for compliance or threat of tangible consequences from refusal. *See Young, supra*.

Furthermore, there was no evidence of a commanding tone in Officer Luffey's comment to Appellant: "I need to speak with you." Although Officer Luffey's comment was a statement, rather than a question, we decline to characterize his initial interaction with Appellant based solely on punctuation. To the contrary, the officers' primary behavior was so temperate that, in response, Appellant and his companion simply separated and turned to walk away. Thus, we conclude the officers' limited contact fell within the ambit of non-escalatory conduct; and their initial interaction with Appellant and his companion was a mere encounter. *See Au, supra*; *Newsome, supra*;

***Young, supra***.

As Appellant pivoted to walk away, however, Officer Luffey observed Appellant remove his hand from his front pocket, loosely cupped around what Officer Luffey immediately identified as "stamp bags." Officer Luffey instantly recognized the bags as common packaging for narcotics, although he could not tell how many bags Appellant had in his hand. Officer Luffey could see the bags were stamped, but he could not see the specific mark involved. When Officer Luffey asked Appellant to open his hand, Officer Luffey saw that Appellant was holding three bags stamped "no pain." Officer Luffey placed Appellant under arrest for possession of a controlled substance and confiscated the bags. The product in the bags tested positive for heroin.

Moreover, under the plain view doctrine, Officer Luffey was standing on a public street when he saw Appellant remove the "stamp bags" from his pocket. Therefore, Officer Luffey observed the "stamp bags" from a lawful vantage point. The incriminating nature of the "stamp bags" was immediately apparent to Officer Luffey, given the totality of the circumstances including his relevant training and experience, which we have already reviewed. Once he recognized the "stamp bags" as narcotics' packaging, Officer Luffey had reasonable suspicion that Appellant was in possession of contraband, which justified further investigation by asking Appellant to open his hand. When Officer Luffey saw three stamp bags marked "no pain," he had a lawful right to access and seize the drugs and probable cause to arrest Appellant for

possession of a controlled substance. ***See Jones, supra***; ***Miller, supra***; ***Colon, supra***. Based upon our independent review of the totality of the circumstances coupled with the trial court's credibility decisions, we conclude the record supports the court's decision to deny Appellant's suppression motion. ***See Arter, supra***; ***Clemens, supra***. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/7/2019