J-S04018-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
v.   :
  :
  :
  :
AARON JAMES GUESS   :
  :
Appellant   :   No. 1335 EDA 2023

Appeal from the Judgment of Sentence Entered January 23, 2023
In the Court of Common Pleas of Montgomery County
Criminal Division at No: CP-46-CR-0000831-2022

BEFORE: BOWES, J., STABILE, J., and LANE, J.

MEMORANDUM BY STABILE, J.:          **FILED MAY 7, 2024**

Appellant, Aaron James Guess, appeals from the January 23, 2023 judgment of sentence imposing an aggregate 60 to 120 months of incarceration for possession of a firearm prohibited. Appellant raises issues relating to the trial court's denial of his motion to suppress. Upon review, we affirm.

We glean the following factual background from the suppression hearings conducted on September 6, 2022 and October 7, 2022:[1] On January 10, 2022, Officer Nathan Walters (hereinafter "Walters") of the Abington Township Police Department responded to a domestic disturbance at a restaurant located at 391 Highland Avenue. N.T., Suppression 9/6/22, at 4-5.

---

[1] We limit our scope of review to the record created during the suppression hearing, since when reviewing a motion to suppress evidence, we may not look beyond the suppression record. ***In re L.J.,*** 79 A. 3d 1073, 1080 (Pa. 2013).

While en route, Walters learned that the male involved in the disturbance had left. *Id.* at 5. When he arrived, the female involved in the disturbance was sitting in her parked vehicle, which displayed a fake paper Delaware license plate. *Id.* at 5-6, 20. Walters was familiar with the female because he stopped her vehicle two months prior for having a similar fake paper license plate. *Id.* at 20. The female declined assistance and Walters did not issue her a citation for the fraudulent license plate since she was parked in a private lot and not driving. *Id.* at 19-21.

Thereafter, Walters spoke with the manager of the restaurant who stated that the male left in a gray or silver Honda. *Id.* at 6. Walters initially checked the area that the manager indicated the vehicle travelled, but was unable to locate it. *Id.* He went back to the restaurant to speak with the female again, but she already left. *Id.* About five to ten minutes later, Walters passed a gray or silver Honda Crosstour with dark window tint about one block from the restaurant travelling in the opposite direction. *Id.* at 6, 16, 19-20. The vehicle matched the description the manager gave and displayed a paper Delaware license plate, like the female's vehicle. *Id.* at 20.

As Walters turned around to follow the vehicle, he ran the plate which came back to a white Ford F-250 that expired in 2021. *Id.* at 7, 16-17. Walters conducted a traffic stop and was unable to see into the vehicle as he approached. *Id* at 7-8. Walters spoke with the driver, who was the sole occupant. *Id.* at 8. Initially, the driver did not have identification and said his name was James Williams. *Id.* Eventually, the driver provided Walters

with a PA identification card identifying him as Aaron Guess. *Id.* at 9. While speaking with Appellant, Walters observed a cell phone on the passenger seat and smelled the odor of burnt marijuana coming from inside the vehicle. *Id.* at 12.

Simultaneously, Walters radioed dispatch for a warrant check. *Id.* at 10. Dispatch advised they had more information that could not be transmitted over the radio. *Id.* Walters waited for back-up to arrive and then returned to his vehicle.[2] *Id.* The information on his screen indicated that Appellant had an active warrant from Tinicum Township. *Id.* Dispatch contacted Tinicum Township and confirmed that the warrant was active and wanted Appellant taken into custody. *Id.* at 11.

Thereafter, Walters and another officer approached the vehicle and asked Appellant to step out of the vehicle. *Id.* Appellant refused, so the officers physically removed him. *Id.* at 11-12. A struggle ensued and Appellant was eventually brought to the ground by three officers. *Id.* at 12. The struggle continued on the ground with Appellant on top of Walters. *See* Commonwealth's Exhibit 2 at 18:55-19:22; *see also* Commonwealth's Exhibit 1 at 18:45-19:20. Two officers eventually got Appellant to his feet and one repositioned himself to deploy a taser. *See* Commonwealth's Exhibit 1 at 19:20-30. When Appellant was tased, his body fell on top of Walters. *Id.* at

---

[2] Walters testified that a back-up unit is automatically sent for every traffic stop because they do not travel with a partner. N.T., 9/6/22, at 24-25.

19:32. At some point during the struggle, the back of Walters' head struck the pavement. N.T., 9/6/22, at 12.

Appellant was searched incident to arrest and Walters recovered two cell phones, in addition to the one observed in the vehicle, and $2,100 in United States currency on his person. *Id.* As a result, Walters applied for and obtained a warrant to search Appellant's vehicle for evidence of drug trafficking. *Id.* at 12-13. The vehicle was towed and secured in the evidence bay pending the search warrant. *Id.* at 15. A search of the vehicle revealed a loaded handgun in the center console, 946 while pills determined to be alprazolam, a gram of white powder later determined to be fentanyl, and several other pills. *Id.* at 13.

Appellant filed a motion to suppress and argued: (1) the stop of the vehicle was without reasonable suspicion or probable cause; (2) the outstanding arrest warrant was invalid; and (3) the search warrant for the vehicle was obtained without probable cause. The trial court denied the motion following the suppression hearings. The parties proceeded to a stipulated bench trial wherein Appellant was found guilty of possession of a firearm prohibited[3] and sentenced to an aggregate term of 60 to 120 months of incarceration. This timely appeal followed. Appellant and the trial court have complied with Pa.R.A.P. 1925.

---

[3] As part of the stipulation to proceed with a bench trial, the Commonwealth withdrew the remaining fourteen charges, including five felony charges. *See* N.T., Bench Trial 1/23/23, at 5.

- 4 -

Appellant raises two issues for our review:

1. Did the [trial] court err in denying [Appellant]'s motion to suppress on the ground that the arresting officers lacked probable cause to arrest [Appellant] since the warrant serving as the basis for his arrest was invalid and the video evidence introduced at the suppression hearing fails to support the [trial] court's finding that [Appellant] "attacked" the arresting officers thereby creating an intervening basis for arrest?

2. Did the [trial] court err in failing to suppress all evidence recovered from [Appellant]'s car where the facts set forth in the affidavit of probable cause for the search warrant for the vehicle failed to establish probable cause that the vehicle contained contraband and failed to establish any nexus between the vehicle and [Appellant]'s suspected drug-trafficking activity?

Appellant's Brief at 3.

Our standard of review when addressing a challenge to the denial of a suppression motion is

limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

*Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017) (internal citations omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Luczki*, 212 A.3d 530, 542 (Pa. Super.

- 5 -

2019). "If there is sufficient evidence of record to support the suppression court's ruling and the court has not misapplied the law, we will not substitute our credibility determinations for those of the suppression court judge." *Commonwealth v. Johnson*, 86 A.3d 182, 187 (Pa. 2014).

Here, both parties and the trial court agree that Appellant was subjected to an arrest, which must be supported by probable cause. *See* U.S. Const. amend. IV; Pa. Const. Art. I, § 8; *see also Commonwealth v. Rice*, 304 A.3d 1255, 1260 (Pa. Super. 2023). Thus, we apply the well-established legal standard:

> Probable cause is made out when the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime. The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require *only a probability*, and not a prima facie showing, of criminal activity. In determining whether probable cause exists, we apply a totality of the circumstances approach.

*Commonwealth v. Thompson*, 985 A.2d 928, 931 (Pa. 2009) (internal citations and quotation marks omitted) (emphasis in the original).

In his first issue, Appellant contends that the trial court erred in denying his motion to suppress because the officers lacked probable cause to arrest because (1) the outstanding warrant underlying his arrest was invalid[4] and

_____

[4] The parties subsequently stipulated that the arrest warrant was invalid. N.T., 10/7/22, at 3.

(2) the video does not support the trial court's finding that Appellant attacked the officers thereby creating an independent basis for arrest. Appellant's Brief at 10, 14. He argues the case is analogous to *Commonwealth v. Wertelet*, 696 A.2d 206 (Pa. Super. 1997) (evidence was not sufficient to support conviction of aggravated assault where the defendant's actions did not indicate an intent to cause bodily injury). *Id.* at 13-14. The Commonwealth contends that Appellant's arrest was lawful because he committed an assault on an officer while resisting an unlawful arrest. Commonwealth's Brief at 7.

Our Supreme Court has unequivocally stated that there is no right to resist arrest, under any circumstances. *Commonwealth v. Biagini*, 655 A.2d 492, 499 (Pa. 1995). In *Biagini*, our Supreme Court found there was sufficient evidence to support the co-defendants' convictions for aggravated assault because they were not justified in physically resisting an unlawful arrest. *Id.* at 498. "[A]lthough a "lawful" arrest is an essential element necessary to sustain a conviction for resisting arrest, a determination that the arrest was "unlawful" will never serve as a justification for the act of resistance." *Id.* at 500.

A few years later, this Court was faced with a similar issue in *Commonwealth v. Britt*, 691 A.2d 494 (Pa. Super. 1997), *appeal denied*, 700 A.2d 437 (Pa. 1997). There, the officer attempted to arrest defendant based on a tip from a confidential informant, but the defendant fled in a vehicle. *Britt*, 691 A.2d at 494-95. We found the officers lacked probable

cause to arrest based on the CI's tip. *Id.* at 498. However, we found probable cause existed to arrest the defendant for aggravated assault because the defendant's "conduct in fleeing from the officers after they had identified themselves as police constituted the type of conduct designed to inflict bodily injury." *Id.* at 497. Conversely, this Court in ***Wertelet*** found there was insufficient evidence to sustain the conviction of aggravated assault because the defendant's act of kicking while "she was flailing about and squirming while the troopers attempted to handcuff her" did not inflict bodily injury. ***Wertelet***, 696 A.2d at 212.

Here, the trial court found that Appellant's act of resistance constituted an aggravated assault[5] which gave the officers probable cause to arrest. Trial Court Opinion, 6/16/23, at 9-10. The entire interaction between Appellant and the officers was recorded on Walters' body-worn camera, as well as his dashboard camera. Both videos were played during the suppression hearing and are relied upon by the parties and the trial court for this appeal. The crux of the issue is whether the video supports the trial court's finding that Appellant attacked the officers thereby creating an independent basis for probable cause to arrest. The question is not whether there is sufficient

---

[5] "A person is guilty of aggravated assault if he attempts to cause or intentionally or knowingly causes bodily injury to any of the officers, agents, employees or other person enumerated in subsection (c), in the performance of duty." 18 Pa.C.S.A. § 2702(a)(3).

evidence to support a conviction of aggravated assault, rather it is whether there was probable cause to arrest Appellant.

We find that the record supports the trial court's finding that Appellant physically attacked the officers while resisting an unlawful arrest thereby creating an independent basis for probable cause to arrest. Walters testified to the following sequence of events:

> I approached the vehicle again with my partner next to me. I informed [Appellant] to get out. He said why or he wasn't going to or something to that effect. And I reached in, I grabbed him. I said – I told him there's a warrant for your arrest.
>
> And he continued to disagree with me and argue with me, refused to get out of the car. I had to enter the vehicle, in his lap, basically, to control his hands, and me and another officer had to pull him out of the car. He continued to resist us, fight with us on the side of the road next to his vehicle. He refused to turn around. We eventually had to go to the ground.
>
> At that point [Appellant] got on top of me and my head struck the pavement. The back of my head struck the pavement in the middle of the street. It took a third officer to get there to finally take [Appellant] into custody.

N.T., 9/6/22, at 11-12. Based on this testimony, combined with the videos, the trial court found Appellant "violently resisted, which resulted in an aggravated assault charge." Trial Court Opinion, 6/16/23, at 9. Regarding Appellant's assertion that the video evidence does not support this finding, the trial court stated:

> At the 17:50 mark of the video, Officer Walters attempted to take [Appellant] into custody, but [Appellant] began resisting. The video indicates a violent struggle occurred, which continued for approximately two and one-half minutes. Following the conclusion of the struggle, [Appellant] states "sorry for resisting"

- 9 -

which occurs at the 20:55 mark of the video. Officer Walters indicates that he is bleeding at the 21:45 mark. Although the video may not clearly or completely capture [Appellant]'s act of attacking the arresting officers, **the video does not contradict or rebut Officer Walter's first-hand observation** that [Appellant] fought with him and the other officers.

*Id.* (internal citations omitted) (emphasis added).

We agree with the trial court that the videos do not contradict or rebut Walter's testimony; therefore it was free to credit Walter's testimony and find Appellant committed aggravated assault while resisting an unlawful arrest.[6] However, we note that the videos indicate that there were two instances where Appellant was on top of Walters on the ground which could have resulted in Walters' head striking the pavement. First, immediately after the officers physically removed Appellant from the vehicle, he continued to resist while standing against his vehicle. *See* Commonwealth's Exhibit 2 at 18:15-45. A brief struggle ensued which resulted in Walters falling to the ground and Appellant landing on him. *Id.*

Second, after Walters and Appellant fell to the ground, the struggle continued with the pair on the ground, and Walters yelled to another officer

---

[6] A video recording made part of the certified record may, in rare cases, contradict a trial court's factual findings that are based on credibility determinations. *See Commonwealth v. Griffin*, 116 A.3d 1139, 1143 (Pa. Super. 2015). We subsequently clarified that *Griffin* applies solely where the video in question blatantly contradicts the officer's testimony such that we would be compelled to reject the trial court's credibility determinations. *See Commonwealth v. Goral*, 2019 WL 4888503 at *3 (Pa. Super. 2019) (unpublished memorandum). This is not the case here.

- 10 -

to "just tase his ass." **See** Commonwealth's Exhibit 2 at 18:55-19:22; **see also** Commonwealth's Exhibit 1 at 18:45-19:20. Two officers got Appellant to his feet, and one repositioned himself to deploy the taser. **See** Commonwealth's Exhibit 1 at 19:20-30. When Appellant was tased, his body fell on top of Walters. **Id.** at 19:32. After Appellant is detained, he apologized for resisting arrest. **See** Commonwealth's Exhibit 2 at 20:57. Thereafter, Walters stated that he was bleeding from his head. **Id.** at 21:45-48.

Based on our standard of review and applicable law regarding probable cause to arrest, we find that the trial court did not err when it denied Appellant's suppression motion. Since the record supports the factual findings and the trial court did not misapply the law, we will not disturb the trial court's credibility determinations. **See Johnson, supra.** Moreover, the totality of the circumstances at the time of arrest would warrant a reasonable person to believe that Appellant committed an assault. **See Thomspon, supra.** In light of this separate independent basis to arrest, we need not examine whether the trial court erred in denying suppression based upon Appellant's contention that probable cause to arrest was lacking due to an invalid arrest warrant.

In his second issue, Appellant contends that the trial court erred in denying his motion to suppress evidence seized from his vehicle because the affidavit of probable cause for the search warrant failed to prove a nexus

between his vehicle and any criminal activity.[7] Appellant's Brief at 15. We disagree.

To be valid, a search warrant must be supported by probable cause. ***Commonwealth v. Jacoby***, 170 A.3d 1065, 1081 (Pa. 2017). Regarding search warrants, our Supreme Court has explained:

> The existence of probable cause is measured by examining the totality of the circumstances. Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he [or she] has reasonably trustworthy information are sufficient in and of themselves to warrant a [person] of reasonable caution in the belief that a search should be conducted. A magisterial district judge, when deciding whether to issue a search warrant, must make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. Conversely, [a] court reviewing a search warrant determines only if a substantial basis existed for the magistrate to find probable cause.

***Id.*** at 1081-82 (internal citations and quotation marks omitted). In determining whether a warrant was supported by probable cause, our scope of review is limited to the four corners of affidavit. ***Commonwealth v. Coleman***, 830 A.2d 554, 560 (Pa. 2003). A police officer's experience and training may be relevant factors in the probable cause determination. ***Thompson***, 985 A.2d at 935. However,

---

[7] The Commonwealth argues that Appellant waived any challenge to the nexus between Appellant's vehicle and criminal activity because it was not specifically raised in the lower court. Commonwealth's Brief at 16. We disagree. A probable cause analysis requires a finding of a nexus between the person or place to be searched and the alleged criminal activity. ***See Jacoby***, ***infra***.

- 12 -

> We caution . . . that an officer's testimony in this regard shall not simply reference training and experience abstract from an explanation of their specific application to the circumstances at hand. . . . [A] court cannot simply conclude that probable cause existed based upon nothing more than the number of years an officer has spent on the force. Rather, the officer must demonstrate a nexus between his experience and the search, arrest, or seizure of evidence. Indeed, a factor becomes relevant only because it has some connection to the issue at hand.

*Id.* (internal citations and quotation marks omitted). "Probable cause, at a minimum, must be individualized to the suspect and the circumstances of the case; it requires more than generalized statements about human behavior that are unsupported by the specific facts." *Jacoby*, 170 A.3d at 1084.

In finding that the warrant was supported by probable cause, the trial court stated:

> Walters detailed his training and experience [in narcotics investigations] and listed the facts to support his assertion that a criminal offense had been or was being committed and that items related to this offense would be found in the vehicle. These factors included [Appellant]'s use of a fake name, the presence of a large amount of U.S. Currency and two cell phones on [Appellant]'s person, in addition to a third cell phone in plain view inside the vehicle which, in the officer's experience, were all indicative of drug trafficking. Officer Walters also referenced the odor of burnt marijuana emanating from the vehicle. These facts were sufficient to cause a person of reasonable caution to conclude that [Appellant] was involved in drug trafficking and a fair probability existed that contraband or other evidence of drug trafficking would be found inside the [vehicle].

Trial Court Opinion, 6/16/23, at 10 (internal citations omitted). We agree.

The affidavit of probable cause is approximately ten pages long. The first six pages extensively detail Walters' training and experience, and the knowledge he has gained from that training and experience. He details the

- 13 -

various task forces he has been a part of, that he's been involved in 249 drug delivery resulting in death investigations and over 100 other narcotics investigations, the different trainings relative to narcotics investigations that he has completed, and his experience in obtaining and executing search warrants, conducting surveillance of alleged drug violators, and analyzing cell phone data. *See* Commonwealth's Exhibit 3, Probable Cause Affidavit, 4-7. He then includes numerous statements of the knowledge he gained through his training and experience:

a. That drug traffickers use cellular telephones . . . [and] [t]he use of multiple telephones makes wiretapping telephones difficult and helps to insulate the drug dealer from detection.

b. That narcotics traffickers commonly maintain addresses or telephone numbers [of their associates] . . . in their cellular phones.

c. That narcotics traffickers take . . . photographs of themselves, their associates, their property, and their product . . . [and] usually maintain these photographs . . . in their cellular phones.

d. That narcotics traffickers very often place assets in names other than their own to avoid detection of these assets by government agencies.

e. That even though these assets are in other persons names, the narcotics traffickers actually own and continue to use these assets and exercise dominion and control over them.

f. That narcotics traffickers must maintain on hand large amounts of U.S. Currency in order to maintain and finance their ongoing narcotics business.

g. That narcotics traffickers maintain books, records, receipts, notes, ledgers, money orders, and other documents relating to the transportation, ordering, sale and distribution of controlled substances.

h. That it is common for drug traffickers to secrete contraband proceeds of drug sales, and records of drug transactions in secure locations within their residences, and/or vehicles to conceal them from law enforcement authorities.

i. That persons involved in large scale drug trafficking often conceal in their residences and vehicles a cache of drugs, large amounts of currency . . . and evidence of financial transactions relating to the obtaining and secreting of large sums of money acquired from engaging in narcotic trafficking activities.

j. That when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits, i.e. "launder[.")

k. That the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money").  It is common for narcotics traffickers to separate their "Street Money" by denomination and put this currency in rubber band stacks in varying increments to facilitate quick counting.

l. That [c]ourts have recognized that the small and medium denominations of questionable currency, along with the way the currency is handled, carried, and concealed, may establish probable cause that questionable currency is linked to illegal drug transactions.

m. That it is common for narcotics traffickers to exchange "street money" (small denominations) for large denominations of currency, which can be concealed in secure locations within their residences . . .

n. That I am aware that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

o. That based on my training and experience, I know drug traffickers commonly have in their possession (that is on their persons, at their residences and/or their vehicles), firearms. . .

*Id.* at 7-10. Walters included specific and articulable facts to show that there is a fair probability evidence of drug trafficking would be found in Appellant's vehicle:

INITIAL INCIDENT

On January 10, 2022 at 1634 hours I was on duty in full uniform operating a fully marked patrol car. At that time I was dispatched to Bernie's Restaurant . . . for the report of a domestic in the business. Upon my arrival, I spoke to the caller (Bernie's Manager) who stated that the male half of the domestic had left the area [i]n a gray in color Honda and was last seen going towards Jenkintown Road. The female half was sitting in her vehicle (black in color Volkswagen) still in the parking lot.

I made contact with the female . . . and asked if she was ok. I observed [her] to be crying and she stated that she was fine and that she was having an argument with her "ex". I spoke to [her] for several minutes and she continued to express that she was ok and did not want any police involvement. After speaking to [her], I observed that her vehicle displayed a fake Delaware paper tag.

I later ran [the female]'s information and discovered that she had an active arrest warrant for PWID out of Philadelphia. I was still in the area so I checked back at Bernie's and observed that she had left the area. A short time later, I observed a gray in color Honda Crosstour . . . [which] had dark window tinting that prevented me from viewing the interior and it also displayed a fake paper Delaware registration, similar to the one I observed on [the female]'s vehicle. I know through my training and experience that fake paper tags [are] commonly used by people attempting to conceal their identities from law enforcement. Your affiant is aware that fake paper tags from Delaware, Pennsylvania and New Jersey are very common in the Philadelphia area and he has had numerous interactions with fake paper tags . . . and during the course of those investigations, your affiant has also discovered other fake/fraudulent documents inside the vehicle that was displaying the fake paper tag.

I got behind the Crosstour and activated my emergency lights and siren in the area of Baeder Road and Wanamaker Road to conduct a traffic stop on the vehicle. . . .

- 16 -

I approached the vehicle and made contact with the driver, later identified as [Appellant], and asked for his driver's license. [Appellant] appeared to look around for his license and said that he did not have it with him. I asked [Appellant] numerous times for his ID or anything with his name on it but initially he said that he had nothing with his name on it and I could "look it up[."] I said "ok" and [Appellant] said that his name was "James Williams[."] [Appellant] later found a bank card with his real name on it and gave it to me. After further questioning, I observed [Appellant] go through more cards and I observed a card that appeared to be a Pennsylvania Identification Card. I asked to see the card and [Appellant] handed over his actual PA ID card . . . I ran the number over county radio and discovered that [Appellant] had an active warrant for his arrest out of Tinicum Township, Delaware County Pennsylvania, for a simple assault charge. While speaking to [Appellant] I smelled burnt marijuana coming from the interior of the vehicle.

[Appellant] was later instructed to exit the vehicle and he immediately resisted as myself and Officer Michael Jones grabbed him to remove him from the vehicle. [Appellant] pushed and grabbed me as I was trying to remove him from the vehicle and I observed him reach towards the "push start" and I believed that he was going to attempt to start the vehicle and flee. I then grabbed his right hand/arm and Officer Jones grabbed his other side and we removed him from the car all while he was yelling and screaming that he did not have a warrant and that he was not going to be arrested. A third [o]fficer arrived on scene and a taser had to be used to gain control of [Appellant]. As a result of him resisting, I sustained cuts and bruises to both of my hands.

After [Appellant] was in custody, he was found in possession of $2,180 in multiple denominations of United States Currency. The cellular phone that [Appellant] was using was recovered as well as a second cellular phone from his jacket pocket. A third cellular phone was observed on the front passenger seat of the vehicle and was not recovered. I asked him for consent to search his vehicle and he stated that everything in the vehicle was his and that no I could not search it. . .

CRIMINAL HISTORY-[APPELLANT]
1. October 20, 2010, arrested by Upper Merion Police and adjudicated delinquent for false identification to law enforcement.

2. January 25, 2013, arrested by Philadelphia Police and adju[di]cated delinquent for [r]obbery, [possessing and instrument of crime], and [b]urglary.

3. July 18, 2015, arrested by Philadelphia and found guilty of conspiracy for [possession with intent to deliver ("PWID")] and possession.

4. June 14, 2016, arrested by Lansdowne Police and plead guilty to false identification to law enforcement.

5. August 3, 2017, arrested by Clifton Heights Police and plead guilty to PWID.

*Id.* at 10-12.

We find that, within the four corners of the affidavit, a substantial basis existed for the magistrate to find probable cause. ***See Jacoby, supra.*** Walters detailed his extensive training and experience in narcotics investigations, as well as the knowledge he gained from that training and experience. He then articulated specific and individualized facts to establish probable cause to search Appellant's vehicle, namely: (1) Appellant's use of a fake name; (2) the use of a fake paper license plate on Appellant's vehicle; (3) the odor of burnt marijuana; (4) the two cell phones on Appellant's person, and additional cell phone in the vehicle; (5) a large quantity of US currency in small denominations; and (6) Appellant's criminal history. Under the totality of the circumstances, the trial court did not err when it denied suppression after finding that the search warrant was supported by probable cause. ***See Jacoby, supra.***

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>5/7/2024</u>