J-S24010-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CLEOTIS RUSSELL | : | |
| | : | |
| Appellant | : | No. 925 WDA 2023 |

Appeal from the Judgment of Sentence Entered June 9, 2023
In the Court of Common Pleas of Washington County Criminal Division at
No(s): CP-63-CR-0001293-2021

BEFORE: BOWES, J., SULLIVAN, J., and STEVENS, P.J.E.*

MEMORANDUM BY BOWES, J.: **FILED: August 16, 2024**

Cleotis Russell appeals from the judgment of sentence of four to eight years of imprisonment imposed upon his convictions for possession with intent to deliver ("PWID") and possession of a controlled substance. We affirm.

The trial court offered the following summary of the facts that were established at Appellant's non-jury trial, which was held after the court denied his pretrial suppression motion:

> On June 23rd, 2021, Officer Patrick Short of the RESA Regional Police Department received a call to do a welfare check at the Spee-D Mart in Stockdale, P[ennsylvania,] around 2:00 p.m. Upon arrival, Officer Short observed a car at a gas pump with a black male behind the wheel who appeared to be sleeping. After having the individual, identified as [Appellant], roll the window down, Officer Short inquired as to whether [Appellant] was okay and why he was sitting at the gas pump. [Appellant] stated to Officer Short that he was tired and going to wire his

_____

* Former Justice specially assigned to the Superior Court.

sister money and that he had been coming from Erie. Officer Short then asked [Appellant] to step out of the vehicle and notified EMS for an evaluation after which [Appellant] refused treatment. Officer Short then inquired from [Appellant] whether he could search the vehicle and was given consent. During his search, Officer Short found a crystal-like substance in a compartment under the left side of the steering wheel that he suspected to be crystal meth. Officer Short notified [Appellant] of his findings and again requested and was given consent to continue searching, finding nothing else of note. After completing his search, Officer Short took the bag of suspected controlled substance and ran a NIK test which was positive for methamphetamine, before logging it as evidence.

Upon being sent to the Pennsylvania State Police Laboratory, Gabriel Llinas, a forensic scientist, tested the evidence in this case confirming that it was methamphetamine weighing 54.09 grams. Trooper Brett Massafra . . . testified as an expert witness in the area of investigations into the Controlled Substance Act. Trooper Massafra testified that typically a personal use amount of methamphetamine would be "small amounts like grams; teeners, which is 1/16th of an ounce; eight balls, that's 1/8th of an ounce, which is 3.5 grams." Trooper Massafra testified the amount present in this case, around three ounces, would have been indicative of [PWID]. Trooper Massafra testified it is unlikely that an individual would purchase that much methamphetamine for personal use and that[,] bought in bulk in 2021[,] that three ounces would probably cost around $2,500. Trooper Massafra clarified that 54 grams would be approximately two ounces but that amount would not change his ultimate opinion. Finally[,] Trooper Massafra testified that slightly under a gram would be the average usage at one time. Th[e c]ourt also heard testimony from [Appellant] and found that [his] testimony as it relates to his interaction with the police officer and his recollection as to how the drugs got into his vehicle were not credible.

Trial Court Opinion, 11/2/23, at 1-3 (footnotes omitted).

Upon this evidence, the trial court convicted Appellant of possession and PWID. After the court sentenced him to the term indicated above, Appellant filed a timely post-sentence motion asserting, *inter alia*, that the PWID

conviction was not supported by sufficient evidence of his intent.[1]  **See** Post-Sentence Motion, 6/20/23, at ¶ 7.  The trial court denied the motion at the conclusion of a hearing held on July 13, 2023.  This timely appeal followed.  The trial court ordered Appellant to file a Pa.R.A.P. 1925(b) statement, and he ultimately filed a *nunc pro tunc* statement with the court's permission.  The court thereafter authored a Rule 1925(a) opinion.

Appellant presents two questions for our review:  (1) "Whether the trial court erred in denying [Appellant]'s post-sentence motion to acquit [him] of [PWID] based on the lack of evidence of his intent[;]" and (2) "Whether the trial court erred in denying [Appellant]'s motion to suppress evidence based on an illegal search and seizure."  Appellant's brief at 6.

We begin with an examination of the law pertinent to Appellant's challenge to the denial of his motion for a judgment of acquittal.  Such a motion "challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge."  **Commonwealth v. Stahl**, 175 A.3d 301, 303 (Pa.Super. 2017) (cleaned up).  In turn:

---

[1] The tenth day after Appellant's sentence was imposed was the Juneteenth holiday.  Therefore, his motion was timely filed when it was received and stamped by the clerk of courts on June 20, 2023.  **See** 1 Pa.C.S. § 1908 (indicating that when a deadline "shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation"); **Commonwealth v. Rice**, 902 A.2d 542, 544 n.1 (Pa.Super. 2006).

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for a fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence received must be considered. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Haahs*, 289 A.3d 100, 104 n.2 (Pa.Super. 2022) (cleaned up). "Furthermore, in conducting our analysis, we consider all of the evidence actually admitted at trial and do not review a diminished record." *Commonwealth v. Koch*, 39 A.3d 996, 1001 (Pa.Super. 2011).

Appellant challenges the evidentiary sufficiency of his PWID conviction.[2] "To sustain a conviction for PWID, the Commonwealth must prove both the

---

[2] The trial court opined that Appellant waived this issue by failing to specify the convictions and elements thereof that he was challenging. *See* Trial Court Opinion, 11/2/23, at 7. However, the trial court understood that it was the intent element that he challenged, as it was raised specifically in his post-sentence motion and addressed in the Rule 1925(a) opinion. *Id*. Accordingly, waiver is not appropriate in this case. *See Commonwealth v. Laboy*, 936 A.2d 1058, 1060 (Pa. 2007) (holding this Court erred in finding waiver of a sufficiency claim in a "relatively straightforward drug case" where the trial court addressed the matter in its opinion).

possession of the controlled substance and the intent to deliver the controlled substance." **Commonwealth v. Roberts**, 133 A.3d 759, 767 (Pa.Super. 2016) (cleaned up). Appellant does not dispute that the Commonwealth established that he possessed a controlled substance. Rather, he argues that it did not prove that he did so with the intent to deliver it to a third party. **See** Appellant's brief at 13-14. Specifically, Appellant asserts that proof of the amount of methamphetamine alone was insufficient to establish his intent to sell or deliver it rather than use it himself. **Id**. at 14-15.

Pertinent to this issue, we have explained:

The intent to deliver may be inferred from possession of a large quantity of controlled substances. It follows that possession of a small amount of a controlled substance supports the conclusion that there is an absence of intent to deliver. If the quantity of the controlled substance is not dispositive as to the intent, the court may look to other factors.

Other factors to consider when determining whether a defendant intended to deliver a controlled substance include the manner in which the controlled substance was packaged, the behavior of the defendant, the presence of drug paraphernalia, and the sums of cash found in possession of the defendant. The final factor to be considered is expert testimony. Expert opinion testimony is admissible concerning whether the facts surrounding the possession of controlled substances are consistent with an intent to deliver rather than with an intent to possess it for personal use.

**Roberts**, 133 A.3d at 768 (cleaned up).

Here, Appellant points to the fact that Trooper Massafra's expert opinion was based upon the "sheer quantity" of the contraband, and that Appellant did not have in his vehicle any indicia of drug sales, such as a large amount of cash, scales, or packaging material. **See** Appellant's brief at 12 (citing N.T.

Trial, 3/3/23, at 62). However, as the Commonwealth observes, there was also no paraphernalia suggesting personal use found in the vehicle. ***See*** Commonwealth's brief at 16. Further, Trooper Massafra testified that methamphetamine packaged for personal use would typically be divided into baggies of eighths or sixteenths of an ounce, not as a single two-ounce mass. ***Id***. at 15 (citing N.T. Trial, 3/3/23, at 61). Moreover, the value of the contraband, once divided and packaged for sale, was between $6,000 and $8,000. ***Id***. at 16 (citing N.T. Trial, 3/3/23, at 65).

We have no hesitation in concluding that the Commonwealth's evidence sufficiently supported the court's verdict. Our review of the certified record confirms that the Commonwealth's proof of Appellant's intent did not solely consist of the magnitude of illicit substance. In addition to that factor, the court heard that it was not packaged in quantities in which a drug user would purchase them, that there was no use paraphernalia such as spoons or a glass smoking pipe with the drugs, and that it had a street value of thousands of dollars. ***See*** N.T. Trial, 3/3/23, at 60-65. Accepting this testimony, the court could have reasonably inferred that Appellant did not have cash or paraphernalia related to dealing the drugs in his car because he had just acquired the current supply to either prepare for sale after he reached his destination, or to sell it to a lower-level dealer who would package the methamphetamine for street sales. ***Accord Roberts***, 133 A.3d at 768-69 (affirming PWID conviction where detective opined that a large amount of

cocaine and crack, each in a single plastic bag, was intended for delivery where there was no drug-use paraphernalia and the absence of cash suggested the defendant had just re-upped his supply).  Therefore, Appellant's first issue lacks merit.

Appellant's remaining question concerns the trial court's ruling on his suppression motion.  The following law governs our consideration of this issue:

> [O]ur standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.  We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*.  Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted.  Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

**Commonwealth v. Singleton**, 169 A.3d 79, 82 (Pa.Super. 2017) (cleaned up).

The Fourth Amendment to the federal constitution guarantees individuals freedom from unreasonable searches and seizures, "including those entailing only a brief detention."[3]  **Commonwealth v. Mattis**, 252 A.3d 650, 654 (Pa.Super. 2021) (cleaned up).  This Fourth Amendment right

---

[3] While there are instances in which the Pennsylvania Constitution affords greater safeguards than the Fourth Amendment, we will treat the constitutional protections as coextensive where, as here, the defendant does not contend otherwise.  **See**, **e.g.**, **Commonwealth v. Lagenella**, 83 A.3d 94, 99 n.3 (Pa. 2013).

"require[s] law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty." *Commonwealth v. Hampton*, 204 A.3d 452, 456 (Pa.Super. 2019) (citation omitted). For this purpose, interactions fall into one of three categories:

> The first is a mere encounter, or request for information, which need not be supported by any level of suspicion. The second category of interaction, an investigative detention . . ., subjects an individual to a stop and period of detention but is not so coercive as to constitute the functional equivalent of an arrest. To survive constitutional scrutiny, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion. Finally, an arrest or custodial detention must be supported by probable cause to believe the person is engaged in criminal activity.

*Commonwealth v. Livingstone*, 174 A.3d 609, 614 n.1 (Pa. 2017) (cleaned up). These categories are thus defined by whether, and to what extent, the police have restrained the individual's movement. In this vein, our High Court has explained:

> To determine whether a citizen's movement has been restrained, courts must consider the totality of the circumstances, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred. . . . [T]he following factors suggest a seizure occurred: the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. . . . [A]bsent evidence of the factors identified above, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Id*. at 621 (cleaned up).

A well-established exception to the warrant requirement "is a search conducted pursuant to consent voluntarily given." *Mattis*, 252 A.3d at 654. This Court has explained:

> The Fourth Amendment analysis in consent cases entails a two-prong assessment: first, the constitutional validity of the citizen/police encounter giving rise to the consent and, second, the voluntariness of said consent. Where the underlying encounter is found to be lawful, voluntariness becomes the exclusive focus. If a defendant's detention violates the Fourth Amendment, then any evidence seized during that stop must be excluded as fruit of an unlawful detention.
>
> Where the purpose of an initial, valid traffic stop has ended and a reasonable person would have believed that he was free to leave, the law characterizes a subsequent round of questioning by the officer as a mere encounter. Since the citizen is free to leave, he is not detained, and the police are free to ask questions appropriate to a mere encounter, including a request for permission to search the vehicle. Nevertheless, where the purpose of an initial traffic stop has ended and a reasonable person would not have believed that he was free to leave, the law characterizes a subsequent round of questioning by the police as an investigative detention or arrest. In the absence of either reasonable suspicion to support the investigative detention or probable cause to support the arrest, the citizen is considered unlawfully detained. Where a consensual search has been preceded by an unlawful detention, the exclusionary rule requires suppression of the evidence.

*Id*. at 654–55 (cleaned up).[4]

_____

[4] Examples of valid initial interactions include instances where the police are engaged in ensuring "the safety and welfare of our Commonwealth's citizens" rather than detecting and investigating crimes. *See Livingstone*, 174 A.3d at 629. Pursuant to this community caretaking doctrine, our High Court has recognized three specific exceptions to the warrant requirement: the
*(Footnote Continued Next Page)*

With these principles in mind, we turn to Appellant's arguments. He concedes that Officer Short's initial interaction with him was a permissible intrusion upon his liberty pursuant to the community caretaker doctrine. *See* Appellant's brief at 10. However, he maintains that the valid interaction ceased once the emergency technicians cleared him and he refused further treatment, and Officer Short's subsequent detention amounted to an investigative detention. *Id*. at 12. Appellant asserts that, because Officer Short failed to articulate specific facts to establish that he had reasonable suspicion that criminal activity was afoot, the detention was unlawful and, consequently, produced an unconstitutional search premised upon invalid consent. *Id*. at 12-13.

The trial court explained its denial of Appellant's suppression motion as follows:

> Here, after EMS finished with [Appellant] when he refused treatment, Officer Short reapproached with a few questions for [him]. While [this] interaction may imbue minor coercion, it is the only factor that does so. The interaction occurred in the middle of the day, [Appellant] was already out of his vehicle, no lights or sirens were activated, Officer Short did not have his weapon drawn, and though he did not inform [Appellant] that he was free to leave[,] he did tell him that he did not have to permit a search of his vehicle and could rescind or limit such permission at any time. Viewed in totality, this continued interaction was not a seizure of [Appellant,] but a consensual encounter and [Appellant] consented voluntarily to Officer Short's search of his vehicle.

---

emergency aid exception; the automobile impoundment/inventory exception; and the public servant exception. *Id*. at 626.

- 10 -

Trial Court Opinion (Suppression), 12/19/22, at 4-5.

The trial court's factual findings are supported by the evidence offered at the suppression hearing. In particular, Officer Short testified that when he arrived at the gas station to find Appellant asleep in his car at a gas pump, the officer parked on the opposite side of the pump rather than blocking him in by pulling in front of or behind Appellant. *See* N.T. Suppression Hearing, 10/17/22, at 12. It was the middle of the day, with other patrons of the gas station coming and going. *Id*. at 11. Officer Short obtained Appellant's identification information and completed a check for outstanding warrants while they awaited the arrival of the EMS vehicle, which pulled in behind Appellant's vehicle.[5] *Id*. at 14-17. He did not handcuff Appellant or call for backup. *Id*. at 10-11.

After Appellant was medically cleared, Officer Short decided to ask Appellant additional questions to learn why he was sleeping at a gas pump in the middle of the day. *Id*. at 18. While the officer did not inform Appellant that he was free to leave after the welfare check concluded, neither did he mandate that Appellant remain. Instead, he asked Appellant if he could search the vehicle, and Appellant consented. *Id*. at 9. Officer Short told Appellant

_____

[5] Officer Short did not recall if Appellant had handed him an identification card or merely orally stated his name and address. In either event, the record does not suggest that the officer had possession of an identification card after he concluded that there were no outstanding warrants. *See* N.T. Suppression Hearing, 10/17/22, at 19.

that he could tell him to stop at any time. *Id*. at 24. The officer located the bag of suspected crystal methamphetamine in a slide-out compartment where "a trunk opening [lever] or parking brake release would normally be on a vehicle." *Id*. The officer reported his finding to Appellant, who said it was not his. *Id*. at 10. After completing the search upon obtaining Appellant's continued consent, Officer Short placed Appellant in handcuffs and transported him to the police station. *Id*. at 10, 24-25

Furthermore, we conclude that the court accurately applied the law to the facts at hand. The conversation between Officer Short and Appellant conversation that occurred immediately after the welfare check had concluded was properly classified by the trial court as a mere encounter. The officer's questioning was informal and was accompanied by no physical or verbal restraint on Appellant's liberty such as blocking him from leaving, ordering him to stay, brandishing a weapon, activating his emergency lights, maintaining possession of Appellant's identification, or any other intimidating actions.

Indeed, the facts of this case are materially distinguishable from cases in which we have deemed suppression warranted. *See Mattis*, 252 A.3d at 656 (holding consent was invalid because the trooper engaged in an unsupported investigative detention rather than a mere encounter when he asked the defendant to exit the vehicle after the initial stop had concluded and retained the defendant's driver's license, prohibiting him from leaving);

*Commonwealth v. Hampton*, 204 A.3d 452, 458–59 (Pa.Super. 2019) (ruling the interaction was not a mere encounter where, although the officer "did not activate her emergency lights or siren, she nevertheless restrained [the defendant]'s freedom of movement by means of physical force when she blocked his exit" (cleaned up)).

Instead, this case is more in line with those in which we concluded that the pertinent interaction was a mere encounter. *See Commonwealth v. Thomas*, 273 A.3d 1190, 1200–01 (Pa.Super. 2022) (concluding interaction was a mere encounter where there was no "evidence suggesting that either officer activated the emergency lights of the patrol car, brandished his weapon, or engaged in an overwhelming show of force" and "neither officer used a commanding tone of voice or informed [the defendant] that he was not free to leave, nor was there any evidence presented that either positioned himself in a manner that obstructed [the defendant]'s ability to continue walking down the street"); *Commonwealth v. Luczki*, 212 A.3d 530, 547–48 (Pa.Super. 2019) (finding a mere encounter occurred where "the interaction occurred in daylight, on a public street, with police officers dressed in plainclothes, and on foot;" it "involved no lights, guns, marked vehicles, intimidating movement or potent show of force, obstruction, or physical restraint[;]" and, while the officers displayed badges, they "conveyed no demand for compliance or threat of tangible consequences from refusal").

Accordingly, because Officer Short sought and received Appellant's consent during a mere encounter rather than a seizure, the consent was voluntary and validated the subsequent search. *See Livingstone*, 174 A.3d at 621; *Mattis*, 252 A.3d at 465. Thus, the trial court did not err in denying Appellant's suppression motion.

Since neither of Appellant's issues gives us cause to disturb his convictions, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 08/16/2024