J-S38007-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMES BROOKS | : | |
| | : | |
| Appellant | : | No. 225 EDA 2025 |

Appeal from the Judgment of Sentence Entered August 19, 2024
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0000390-2023

BEFORE: McLAUGHLIN, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.: **FILED FEBRUARY 10, 2026**

James Brooks appeals from the judgment of sentence imposed following his conviction for persons not to possess firearms.[1] Brooks challenges the court's denial of his motion to suppress and the sufficiency of the evidence. We affirm.

The trial court accurately summarized the facts at the suppression hearing as follows:

> On November 11, 2022, at approximately 2:11 a.m., Pennsylvania Stale Troopers Reginald Washington and Seth Heffner were on patrol on US Route 422 westbound between the Collegeville and Oaks exits when they observed a vehicle approach from the rear with its high beams illuminated to the extent they were obstructing the troopers' vision. [N.T. Suppression, 1/29/24, at 10-11, 35-36]. The vehicle subsequently passed the patrol vehicle and the troopers were able to determine that the subject vehicle was traveling 67 miles per hour in a 55 mile per hour zone. [**Id.**

---

[1] 18 Pa.C.S.A. § 6105(a)(1).

at 12-13, 36, 39]. Following these observations, the troopers proceeded to effectuate a traffic stop of the subject vehicle. [*Id.* at 14].

Trooper Washington approached the passenger side of the subject vehicle and observed the vehicle's sole occupant, later identified as [Brooks], engaging in a great deal of movement which involved moving from side to side and lifting some objects. [*Id.* at 14-17]. When Trooper Washington made contact with [Brooks], the trooper noted that he was constantly moving[. *Id.* at 16-17] . . . [W]hen Trooper Washington asked him what he was looking for, [Brooks] responded his identification or his wallet. [*Id.* at 16]. Trooper Washington also observed that [Brooks's] pants were unbuttoned and unzipped. [*Id.* at 17]. Trooper Washington proceeded to instruct [Brooks] to place his hands on the steering wheel in order to calm him down. [*Id.*].

Trooper Heffner subsequently walked to the front driver's side window of the subject vehicle and observed [Brooks's] pants were unzipped, situated around his thighs and the belt had been undone. [*Id.* at 40, 43]. Trooper Heffner proceeded to look inside the rear driver's side window and observed a firearm [in plain view] underneath the driver's seat. [*Id.* at 44, 64]. Following this observation, Trooper Heffner instructed [Brooks] to exit the vehicle. [*Id.* at 43-44] . . . Trooper Heffner subsequently retrieved the firearm from the vehicle, removed the magazine and opened the chamber in order to render the firearm safe. [*Id.* at 46, 66]. While retrieving the firearm, Trooper Heffner also observed a wallet which was located immediately adjacent to the firearm. [*Id.* at 46, 65]. [Brooks] eventually consented to Trooper Heffner retrieving his identification from inside the wallet. [*Id.* at 48].

Trooper Heffner subsequently returned to his vehicle with [Brooks's] identification and ran an inquiry which revealed that [Brooks] did not possess a license to carry a concealed firearm and had prior felony convictions which did not allow him to possess a firearm. [*Id.* at 53]. Trooper Heffner also [learned that Brooks's driver's license had been suspended. *Id.* at 51] . . . Trooper Heffner eventually placed [Brooks] under arrest and contacted a towing company in order to remove the subject vehicle from the scene. [*Id.* at 54].

Trial Court Opinion, filed 4/14/25, at 1-2.

The Commonwealth charged Brooks with persons not to possess firearms and various traffic offenses. Brooks filed a motion to suppress the firearm obtained from his vehicle during the traffic stop. The court held a suppression hearing and denied the motion. Brooks proceeded with a jury trial, at which the jury was hung, and the court declared a mistrial. The Commonwealth retried Brooks.

At the retrial, Troopers Washington and Heffer testified consistently with their testimony at the suppression hearing. Trooper Washington additionally testified that Brooks "related that the firearm was his wife's and that she had a license to carry but he did not, and also that she had some other firearms as well." N.T. Trial, 5/23/24, at 74. Trooper Washington also testified that Brooks told him that his vehicle was a rental vehicle in his wife's name. *Id.* at 92. Brooks further told Trooper Washington that his pants were undone because he was returning home to Pottstown after visiting "a girl's house around the corner from his grandma's in Philadelphia[.]" *Id.* at 96.

Trooper Heffner additionally testified at trial that when he informed Brooks of the presence of a firearm in his vehicle, Brooks did not seem "upset or shocked." *Id.* at 113, 142. He also stated that, after an investigation, it was determined that the recovered firearm was originally purchased by a person who resided in West Virginia. *Id.* at 127.

The Commonwealth presented evidence that after Brooks's arrest, authorities obtained DNA samples from his mouth using buccal swabs.

Brooks's samples and the firearm were then sent to the Pennsylvania State Police for analysis. There was "an insufficient quality of DNA" on the firearm so no comparison could be made to the DNA samples obtained from Brooks. ***Id.*** at 166.

The Commonwealth presented the testimony of Cesar Ojeda, an employee of the rental car company that the subject vehicle was rented from. The trial court accurately summarized his testimony as follows:

> [Ojeda] testified that whenever a rental vehicle is returned, an agency employee will conduct an external inspection of the vehicle in addition to an internal inspection. (***Id.*** at 197-98). Mr. Ojeda further testified that during the internal inspection, the employee will search for any personal items which the previous renter may have left inside the vehicle. (***Id.*** at 198-199). Mr. Ojeda indicated that in the event any personal items are found, they are returned to the previous renter. (***Id.*** at 199). Following the inspection, the vehicle is washed, vacuumed and locked and parked within the agency's lot. (***Id.*** at 199-200). The keys for the rental vehicles are placed into a lock box which is only accessible to the agency's service writers. (***Id.*** at 200). When a vehicle is ready to be rented by another customer, the agency performs an external and internal inspection in the customer's presence. (***Id.*** at 200-01). In the event any personal items are found during this inspection, they are removed from the vehicle and the service desk contacts the last renter on file regarding the discovery. (***Id***. at 201 ). Mr. Ojeda testified that if a firearm was discovered during one of these inspections, the agency would contact law enforcement. (***Id.***).

Trial Ct. Op. at 15-16.

The Commonwealth presented the testimony of Brooks's ex-wife, Khadijah Berrios. At time of the incident in question, Berrios was married to Brooks. The trial court accurately summarized Berrios's testimony as follows:

> Ms. Berrios testified that she never owned a gun in her life and [Brooks's] statement to police regarding the firearm was incorrect. (N.T. Trial by Jury Volume 2, 5/24/24, at 14-15). Ms. Berrios further testified that she had also never purchased a firearm in her life and had never been to West Virginia at any point during her adulthood. (*Id.* at 15-16). Ms. Berrios also testified that the subject vehicle was her rental car, and prior to the date of [Brooks's] traffic stop, she had never seen a gun inside the vehicle. (*Id.* at 8-9, 14). Ms. Berrios stated that although she served as a public safety officer at Drexel University, the university did not allow anyone serving in this role to carry firearms on campus as part of their duties. (*Id.* at 6[-7]).

Trial Ct. Op. at 15.

Detective David Holtzman of the Montgomery County Detective Division testified that no records existed of Berrios purchasing a firearm in Pennsylvania. N.T., 5/23/24, at 213.

The parties stipulated that Brooks had prior convictions for aggravated assault and possession with intent to deliver a controlled substance. *Id.* at 123-25.

At the conclusion of the trial, the jury found Brooks guilty of persons not to possess firearms. The court imposed an aggregate sentence of eight and one-half to 17 years' incarceration. This appeal followed.

Brooks raises the following issues:

I.      Did the lower court err in denying [Brooks's] motion to suppress on the ground that the Commonwealth failed to establish that the incriminating nature of the firearm in question was immediately apparent at the time it was recovered since insufficient facts existed at that point to establish probable cause that [Brooks] was not licensed to carry a firearm?

     II.     Was the evidence insufficient to sustain [Brooks's] conviction for Persons Not to Possess Firearms in that the Commonwealth failed to establish constructive possession of the firearm in question beyond a reasonable doubt?

Brooks's Br. at 3.

Brooks's first issue challenges the court's denial of his motion to suppress. On appeal from an order denying a motion to suppress, our review is "limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." **Commonwealth v. Ochoa**, 304 A.3d 390, 396 (Pa.Super. 2023) (citation omitted). We "consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the suppression record as a whole." **Id.** (citation omitted).

This Court is "highly deferential to the suppression court's factual findings and credibility determination[s]." **Commonwealth v. Carmenates**, 266 A.3d 1117, 1123 (Pa.Super. 2021) (*en banc*). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." **Id.** (citation omitted). If there is support in the record for the suppression court's findings, we may not substitute our own findings. **Commonwealth v. Batista**, 219 A.3d 1199, 1206 (Pa.Super. 2019). We review the suppression court's legal conclusions *de novo*. **Id.**

Brooks argues that Trooper Heffner lacked probable cause to seize the firearm when he entered the rear driver's side door of Brooks's vehicle, picked up the firearm, unloaded it, and checked it for serial number. Brooks's Br. at 14-15. He points out that "[t]his seizure occurred before [Trooper] Heffner had verified whether [Brooks] was ineligible to carry a firearm." *Id.* at 15. Quoting *Commonwealth v. Hicks*, 208 A.3d 916, 936 (Pa. 2019), Brooks argues that there is "no justification for the notion that a police officer may infer criminal activity merely from an individual's possession of a concealed firearm in public." *Id.* He maintains that the incriminating nature of the firearm "was not immediately apparent at the time Trooper Heffner initially entered the vehicle and seized it" and thus the seizure did not satisfy the plain view exception to warrantless seizures. *Id.* In Brooks's view, Trooper Washington's observation that he was "reaching around beside him and on the passenger's seat" is "inconsistent with any attempt to conceal the firearm in the rear of the driver's seat." *Id.* at 16. He further points out that "[t]he fact that [his] pants were unzipped was also not consistent with [him] removing the gun from his waistband and concealing the weapon since [he] was never observed reaching around to the rear of the driver's seat[.]" *Id.* Brooks also argues that there is "no statutory obligation for a person licensed to carry a firearm to use a holster" or store their firearm in a specific location. *Id.* Brooks concludes that "no factors existed which immediately established the incriminating nature of the firearm in question" and thus the court should have granted his motion to suppress. *Id.* at 16-17.

The Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution protect against unreasonable searches and seizures. "A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies." *Commonwealth v. Strickler*, 757 A.2d 884, 888 (Pa. 2000).

One such exception is the plain view doctrine. "The plain view doctrine provides that evidence in plain view of the police can be seized without a warrant[.]" *Commonwealth v. Luczki*, 212 A.3d 530, 546 (Pa.Super. 2019) (citation omitted). "There can be no reasonable expectation of privacy in an object that is in plain view." *Commonwealth v. Bumbarger*, 231 A.3d 10, 20 (Pa.Super. 2020) (citation omitted). Regarding vehicles, "there is no legitimate expectation of privacy shielding the portion of the interior of an automobile that may be viewed from outside the vehicle by either an inquisitive passerby or diligent police officers." *Commonwealth v. Smith*, 285 A.3d 328, 332 (Pa.Super. 2022). Further, "the Motor Vehicle Code provides the statutory authorization for a police officer to stop a motor vehicle '[w]henever a police officer . . . has reasonable suspicion that a violation of this title is occurring or has occurred [so that he may] secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title." *Id.* at 333 (quoting 75 Pa.C.S.A. § 6308(b)) (alterations in original).

Courts have described the plain view doctrine as a three-prong test. *Luczki*, 212 A.3d at 547. Under the plain view doctrine, a warrantless seizure of an item is only permissible when: "(1) an officer views the object from a lawful vantage point; (2) it is immediately apparent to him that the object is incriminating; and (3) the officer has a lawful right of access to the object." *Commonwealth v. Heidelberg*, 267 A.3d 492, 504 (Pa.Super. 2021) (*en banc*) (citation omitted).

Here, Brooks only takes issue with the second prong of the test. *See* Brooks's Br. at 12-17. Thus, we need only determine whether the incriminating nature of the firearm was "immediately apparent." When reviewing whether an object's criminal nature was immediately apparent to the police officer under the second prong, courts must consider the totality of the circumstances. *Luczki*, 212 A.3d at 547. "In viewing the totality of the circumstances, the officer's training and experience should be considered." *Id.* (citation omitted). "An officer can never be one hundred percent certain that a substance in plain view is incriminating, but his belief must be supported by probable cause." *Smith*, 285 A.3d at 333 (citation omitted). Probable cause

> merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief, that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A practical, non-technical probability that incriminating evidence is involved is all that is required.

*Id.* (citation omitted). "[W]here police officers observe incriminating-looking contraband in plain view in a vehicle from a lawful vantage-point, the lack of

- 9 -

advance notice and opportunity to obtain a warrant provides the officers with a lawful right of access to seize the object in question." ***Commonwealth v. Davis***, 287 A.3d 467, 472-73 (Pa.Super. 2022) (citation omitted).

Here, the court found that the troopers were lawfully permitted to seize the firearm because its incriminating nature was immediately apparent. It explained:

> The troopers had probable cause to initiate a traffic stop of the subject vehicle when they observed the vehicle exceeding the speed limit and the vehicle's use of high beams at a distance under 300 feet. While approaching the vehicle, Trooper Washington observed [Brooks] engage in furtive movements, including reaching around the passenger seat. Trooper Washington also noted that [Brooks] appeared to be frantically searching for something and exhibited an abnormally nervous demeanor. Both troopers also observed that [Brooks's] pants were unbuttoned which, in their training and experience, was indicative of an individual potentially keeping something in their waistband before authorities arrived.
>
> Trooper Heffner subsequently observed a firearm in plain view under the seat in the subject vehicle. The trooper made this observation from a lawful vantage point while standing outside the vehicle and utilizing a flashlight to look inside. Trooper Heffner knew the object to be a firearm from his training and credibly testified that it was extremely unusual for a firearm to be located under the seat of a vehicle in which the operator possesses a license to carry.

Trial Ct. Op. at 10 (citations omitted).

Upon review, we agree with the trial court that the Commonwealth proved that the incriminating nature of the firearm was immediately apparent to the troopers. Trooper Washington testified that when he approached Brooks's vehicle, he observed that Brooks "appeared extremely anxious and

nervous, searching around in his vehicle, reaching around beside him and on the passenger's seat." N.T., 1/29/24, at 16. He noticed that was there was a lot of "uncontrolled movements" in the vehicle by Brooks, Brooks's voice was "shaky and nervous," and Brooks's pants were unbuttoned. *Id.* at 15, 17. Trooper Washington testified:

> In situations where people are nervous, they're, like, moving about in their vehicle, they don't know where things are, they're fidgety, they're just constantly moving around. And at that point, you -- as a trooper, you're coming up on this vehicle. You don't know what's going on. You don't know if this person has anything in the vehicle that's illegal, or a weapon or anything like that. So you're just observing their body movements, their hands and things like that.
>
> And when you see a person's pants unbuttoned, you don't know why. Like, something could be in the waistband. You don't know. It's just things are running through your head. He's fidgeting about in the vehicle with his hands all over the place[.]

*Id.* at 18.

Trooper Heffner, who had been a police officer for eight and a half years, testified that as he was approaching Brooks's vehicle, he overheard Trooper Washington tell Brooks to "just relax." *Id.* at 28, 41-42. Trooper Heffner then observed that "Brooks's pants [we]re almost around his thigh area and completely unbuttoned, zipper down and the belt completely unlatched." *Id.* at 43. Trooper Heffner found this to be "completely abnormal" and considered whether Brooks was "keeping something around his waistband or in his pants that he was maneuvering before we got up there, based on the movement that he was doing[.]" *Id.* Trooper Heffner then observed a firearm in plain

- 11 -

view on the floorboard of the vehicle. *Id.* at 44. He testified he knew that the object was a firearm or a replica of a firearm "[b]ased on [his] training, experience, and dealing with firearms in the past[.]" *Id.* Trooper Heffner stated that he believed that Brooks "had the firearm in his pants at the time of the traffic stop and was quickly trying to get rid of it." *Id.* at 45. Trooper Heffner testified that, in his experience in conducting traffic stops, individuals who are lawfully licensed to carry a firearm readily acknowledge that they have a firearm in the vehicle and the firearm is usually stored "either on their person, in their center console, or in the glove box." *Id.* at 44. He testified that he had "never pulled someone over that has stored their firearm underneath the driver's seat." *Id.* at 44-45.

The record demonstrates that, under the totality of the circumstances, including the troopers' training and experience, the incriminating nature of the firearm was immediately apparent. We are mindful that the mere presence of a firearm, without more, is not suggestive of criminal activity. *See Hicks*, 208 A.3d at 936. However, here, the troopers did not base their determination on the mere presence of the firearm in Brooks's vehicle. Rather, the troopers' decision was based on additional observations, including Brooks's furtive movements, the location of the firearm on the floorboard, Brooks's extreme nervousness, and Brooks's pants being unbuttoned down to his thighs. *See Smith*, 285 A.3d at 333-34 (concluding that the incriminating nature of a firearm found in plain view on the rear floorboard of a vehicle after a lawful traffic stop was immediately apparent; officer, who had 10 years of

experience, observed an extended magazine on the gun, which indicated that it was a "ghost gun" made of homemade parts). Under these circumstances, the incriminating nature of the firearm was immediately apparent and thus, the second prong of the plain view doctrine was satisfied. *Luczki*, 212 A.3d at 547. Accordingly, because the trial court's factual findings are supported by the evidence of record and its legal conclusions are correct, we conclude that the court did not err in denying the suppression of the firearm.

In his second issue on appeal, Brooks challenges the sufficiency of evidence to support his conviction for persons not to possess firearms. He argues that the Commonwealth failed to establish that he constructively possessed the firearm at issue. Citing **Commonwealth v. Duffy**, 340 A.2d 869 (Pa.Super 1975), Brooks argues that "dominion and control cannot be inferred merely from the fact that a firearm is located under the car seat where one is sitting." Brooks's Br. at 20. Brooks maintains that the facts do not "support the inference that [he] placed the firearm under the seat." *Id.* He points out that Trooper Washington testified that Brooks "was reaching around in the area of the passenger's seat" and "[a]t no time, did [Trooper] Washington indicate that he saw [Brooks] reaching to the rear of the driver's seat." *Id.* He further notes that the firearm was "located on the floor at the rear of the driver's seat – an area that would be nearly impossible to reach while sitting in the driver's seat." *Id.* He concludes that the evidence was insufficient to establish that he constructively possesses the firearm. *Id.*

The sufficiency of the evidence is a question of law. Therefore, "[o]ur standard of review is *de novo*, and our scope of review is plenary." ***Commonwealth v. Mikitiuk***, 213 A.3d 290, 300 (Pa.Super. 2019). When reviewing a challenge to the sufficiency of the evidence, we "must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt." ***Commonwealth v. Feliciano***, 67 A.3d 19, 23 (Pa.Super. 2013) (*en banc*) (citation omitted). "Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail." ***Id.*** (citation omitted). This standard applies equally where the Commonwealth's evidence is circumstantial. ***Commonwealth v. Patterson***, 180 A.3d 1217, 1229 (Pa.Super. 2018). This Court "may not substitute our judgment for that of the factfinder." ***Commonwealth v. Griffith***, 305 A.3d 573, 576 (Pa.Super. 2023). The factfinder, "while passing on the credibility of the witnesses and the weight of the evidence[,] is free to believe all, part, or none of the evidence." ***Commonwealth v. Miller***, 172 A.3d 632, 640 (Pa.Super. 2017).

To prove possession of a firearm by a prohibited person, the Commonwealth must show that the defendant was: (1) prohibited from possessing a firearm under Section 6105(b), and (2) possessed a firearm. ***See*** 18 Pa.C.S.A. § 6105(a)(1). A firearm includes any weapon that is "designed to or may be readily converted to expel any projectile by the action of an

- 14 -

explosive or the frame or receiver of any such weapon." 18 Pa.C.S.A. § 6105(i).

Possession can be established "by proving actual possession, constructive possession, or joint constructive possession." ***Commonwealth v. Parrish***, 191 A.3d 31, 36 (Pa.Super. 2018) (citation omitted). "Where a defendant is not in actual possession of the prohibited items, the Commonwealth must establish that the defendant had constructive possession to support the conviction." ***Id.*** Constructive possession exists where the defendant has "the power to control the contraband and the intent to exercise that control." ***Commonwealth v. Hopkins***, 67 A.3d 817, 820 (Pa.Super. 2013) (citation omitted). "Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not." ***Commonwealth v. McClellan***, 178 A.3d 874, 878 (Pa.Super. 2018).

The Commonwealth may prove constructive possession by the totality of the circumstances. ***Hopkins***, 67 A.3d at 820. "[A] defendant's mere presence at a place where contraband is found or secreted is insufficient, standing alone, to prove that he exercised dominion and control over those items." ***Parrish***, 191 A.3d at 37. "Rather, knowledge of the existence and location of the contraband is a necessary prerequisite to proving the defendant's intent to control, and, thus, his constructive possession." ***Id.*** When a firearm or other contraband is located inside of a vehicle, the fact that an individual was not the owner of the vehicle, or the possibility that the contraband may have been primarily possessed by someone else, does not

render the evidence insufficient to prove a defendant's constructive possession of the contraband. ***Commonwealth v. Wright***, 255 A.3d 542, 554 (Pa.Super. 2021).

Here, the trial court found that the Commonwealth presented sufficient evidence that Brooks constructively possessed the firearm. ***See*** Trial Ct. Op. at 16. Based on our review of the record and viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we find no error in the court's conclusion. The evidence showed that Brooks was the sole occupant of the vehicle at the time of the lawful traffic stop. The firearm was located within Brooks's reach. Brooks's wallet containing his identification was located adjacent to the firearm. Brooks displayed nervousness, made constant movements, and had his pants undone to his thighs. When the troopers informed Brooks that a firearm was found in his car, he expressed no surprise and told them it belonged to his wife, Berrios. Berrios testified that she never owned a firearm in her lifetime and Detective Holtzman confirmed that there was no record of Berrios purchasing a gun in Pennsylvania. The testimony by Ojeda, the employee from rental car company, established that any personal items left behind by a previous renter would have been noticed by the company and returned to its renter or to the authorities. Further, the Commonwealth was not required to establish any DNA links of the firearm to Brooks. The jury was permitted to credit the testimonial and circumstantial evidence linking Brooks to the firearms. A review of the totality of the evidence leads to the conclusion that it was sufficient to prove that Brooks had the

intent and ability to control the firearm. The evidence was thus sufficient to convict Brooks of persons not to possess firearms.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/10/2026